**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KARIMU HAMILTON,** | : | **Civil Action No.  19-cv-2599** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **CHRISTOPHER FLANAGAN, et al.** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW, this      day of                          2023, upon consideration of the Daubert Motion of the Radnor Individual Defendants and, in particular, Officer Patrick Lacy, to Preclude the Testimony of Plaintiff's Liability Expert and Plaintiff's response thereto, it is hereby ORDERED and DECREED that:  said Motion is granted and Plaintiff's expert, Mickie W. McComb, is precluded from testifying at trial.

 

 

_____
The Honorable Mitchell S. Goldberg

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KARIMU HAMILTON, | : | Civil Action No.  19-cv-2599 |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| CHRISTOPHER FLANAGAN, et al. | : | |
| | : | |
| **Defendants** | : | |

**RADNOR INDIVIDUAL DEFENDANTS' MOTION TO**
**PRECLUDE THE TESTIMONY OF MICKIE W. McCOMB**

Pursuant to Federal Rules of Evidence 702, 703 and 403, the Radnor Individual Defendants and in particular, Officer Patrick Lacey, respectfully request that the Court grant this Motion to preclude Mickie W. McComb from providing trial testimony.  In support of this Motion, said Defendants rely upon the accompanying Memorandum of Law and incorporate by reference the Statement of Facts and exhibits provided to the Court in their Motion for Summary Judgment as though the same were set forth at length hereinafter.

Oral argument on this Motion is respectfully requested.

Respectfully submitted,
**HOLSTEN ASSOCIATES, P.C.**

BY:    **RPD2724_____**
**ROBERT P. DIDOMENICIS, ESQUIRE**
**Attorney ID No. 30482**
**115 N. Jackson Street**
**Media, PA  19063**
**(610) 566-7583**
**rdidomenicis@holstenassoc.com**
**Attorney for the Radnor Individual Defendants**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KARIMU HAMILTON,** | : | **Civil Action No.  19-cv-2599** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **CHRISTOPHER FLANAGAN, et al.** | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION
TO PRECLUDE THE TESTIMONY OF MICKIE W. McCOMB**

**I.     INTRODUCTION**

Plaintiff initiated this action against multiple individual Radnor Township Police Officers and two members of the Community Development Department who handle code enforcement in the Township.  Plaintiff's Third Amended Complaint sets forth multiple counts against various individuals including Co-Defendants.  Two of those counts assert a claim for excessive force and unlawful detention under the 4th Amendment for an incident that occurred on June 11, 2019.

Plaintiff has offered the Curriculum Vitae and report of Mickie W. McComb as an expert in the area of use of force and professional standards in the law enforcement community.  McComb has a report dated January 5, 2023, 23 pages in length and a Curriculum Vitae which are attached hereto and marked Exhibits R1 and R2, respectively.  McComb does not address the actions of any other officers or any training, policies or practices of the Township but reaches the conclusion that Officer Lacey used unreasonable force and his detention of the Plaintiff constituted false arrest.  Although these issues are addressed in the Defendants' Motion for Summary Judgment, Defendants and in particular, Officer Lacey, contends that the proposed testimony of Mr. McComb does not meet the standards of the Federal Rules of Evidence and should be barred.  It is obvious

that his methodology is lacking and his recitation of law invades the province of the Court and jury. In essence, he attempts to offer his opinion on flawed methodology over fact issues that might otherwise need to be left for the jury and legal issues which the Court controls.

## II.    FACTUAL BASIS FOR A MOTION

McComb attaches as Exhibit B to his Curriculum Vitae the items that he reviewed in order to prepare his report. Items of interest include the deposition of the Plaintiff, the deposition of Officer Lacey, the Use of Force Report of Officer Lacey and the Event Chronology provided by the Delaware County Communications Center. He reviewed a statement of Plaintiff. He did not review any other depositions including depositions of Officer Greaves, Sgt. Gluck or Supt. Flanagan, all of whom had responded to the scene. He never reviewed the deposition of Justin Ridgeway who initially called 911 which required the police response. He itemizes several Supreme Court cases and Third Circuit cases that he has reviewed, several of which have no bearing on the issues before the Court. In other words, the methodology used based on these materials that he reviewed is entirely lacking with respect to the actual factual basis of the incident on June 11, 2019. He cites multiple portions of the testimony of Plaintiff and Officer Lacey by cherry picking portions of their testimony. He ignores the report of Officer Greaves who prepared the Incident Report. He also ignores the fact that Officer Lacey called in that the incident was under control in less than 17 seconds. In essence, he accepts as true all of Plaintiff's testimony and ignores the testimony of Officer Lacey and others. In fact, he takes the position that she was holding hedge clippers when in fact her Complaint asserts that she had a handsaw (¶25 of the Third Amended Complaint) and others identified it as a knife or saw blade. Of course, any of these items could be used as deadly weapons, a fact which McComb apparently ignores.

He also ignores the fact that the police were responding with tones for an emergency situation of which they had little information other than the fact that a woman with a knife had threatened the 911 caller.

His report is rife with impermissible legal conclusions and irrelevant opinions regarding same and he fails to identify with precision and certainty the actual factual issues that will assist a jury in assessing the case. There is no Monell claim in this case as the Township is not a defendant. Although he notes that there are variations between the testimony of Plaintiff and Officer Lacey, he goes on to accept, in its entirety, the testimony of Plaintiff. He then goes on to cite cases that have no factual relevance to the underlying case in terms of the fact patterns that gave rise to the opinions. Many of these cases involve automobile searches and are not Third Circuit cases that have any relevance to the underlying facts. He goes on to indicate in his opinion that the "temporary detention of Karimu Hamilton by Officer Lacey and the Radnor Township Police Department on June 11, 2019 was unreasonable, constituted false arrest and violated acceptable police practices, policies, procedures and training." This is in addition to his testimony that Officer Lacey used unreasonable force.

The Moving Defendants attach hereto the report of Officer Greaves regarding this incident, the Use of Force Report of Officer Lacey and incorporate the Statement of Undisputed Facts supporting the Motion for Summary Judgment as though the same were set forth at length hereinafter.

## III.    ARGUMENT

### APPLICABLE STANDARDS

Rule 702 of the Federal Rules of Evidence provides that an expert's testimony will be admissible only if the scientific, technical or other specialized knowledge to which the expert will

testify will assist the trier of fact.  It is the role of the trial judge to act as gatekeeper to ensure that any and all expert testimony is both relevant and reliable.  See Kumho Tire Co., Ltd., v. Carmichael, 526 U.S. 137 (1999); Kannankeril v. Terminix Int'l, 128 F.3d 802, 806 (3d Cir. 1997); In re Paoli Ry. Yard Litigation, 35 F.3d 717, 742-43 (3d Cir. 1994), cert. denied, 115 S. Ct. 1253 (1995).  In performing this "gatekeeper" function, the trial judge has "considerable latitude in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co., Ltd., 526 U.S. at 151-52. The judge must "look behind" the expert's opinions and "analyze the adequacy of its foundation." Mid-State Fertilizer Co. v. Exchange Nat. Bank, 877 F.2d 1333, 1339 (7th Cir, 1989). Furthermore, the proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. See Oddi v. Ford Motor Co., 234 F.3d 136, 144 (3d Cir. 2000), cert. denied, 121 S. Ct. 1357 (2001).

The Court when faced with a proffer of expert testimony must consider "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." See Walker v. Gordon, 46 F. App'x 691 (3d Cir. 2002)(not precedential), citing Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592 (1993).   These gatekeeping functions apply to all proposed expert testimony. Kumbo Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).  The Third Circuit instructs us that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citing In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 741-43 (3d Cir. 1994)).  Qualification is based upon the witness' specialized expertise.  Id.  The reliability restriction requires the expert's testimony to be "based on the methods and procedures of science, rather than on subjective belief or unsupported speculation; the expert must have 'good grounds' for his or her belief."  Id.  Finally, the fit requirement means that the expert's testimony must be

relevant to the case and assist the trier of fact. Id. In other words, there must be "a valid scientific connection to the pertinent inquiry." Id.  (citing Daubert, 509 U.S. at 591-92).  Testimony will be excluded if irrelevant under Rule 401, and likely to mislead or confuse the jury, in violation of Rule 403. Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 provides in relevant part, "[e]vidence which is not relevant is not admissible." Rule 403 provides that otherwise relevant evidence may be excluded where its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. F.R.E. 403; United States v. Levy, 865 F.2d 551, 558 (3d Cir. 1989) (en banc) (evidence will be excluded where likely "to arouse the jury's sense of horror, provoke its instinct to punish, or lead the jury to base its decision on something other than the established facts in the case.")  As set forth below, Mr. McComb's testimony should be precluded insofar as it does not meet the standards of the Federal Rules of Evidence or the prerequisites of Daubert and its progeny.

Moreover, even if there was a violation of a particular training standard or directive, this does not give rise to a claim under the U.S. Constitution.  See Davis v. Scherer, 468 U.S. 183 (1984); Boveri v. Saugus, 113 F.3d 4, 7 (1st Cir. 1997); Jones v. Chieffo, 833 F. Supp. 498, 506 (E.D. Pa 1993), aff'd w/o op., 22 F.3d 301 (3d Cir. 1994); and Amsden v. Moran, 904 F.3d 980, 989 (1st Cir. 1990); see also, Grazier et al. v. City of Philadelphia et al., 2001 U.S. Dist. LEXIS 15876 (E.D. Pa. 2001), aff'd Grazier v. City of Philadelphia, 328 F.3d 120, 127 (3d. Cir 2003) (instruction to the jury that a "violation of police directives does not automatically constitute a

violation of the laws of Pennsylvania or the Constitution" was a correct statement of the law and would not result in new trial).

IV.    <u>**CONCLUSION**</u>

For the reasons set forth more fully herein and the exhibits attached hereto and incorporated herein, Officer Patrick Lacey and the remaining Radnor Individual Defendants respectfully request that the Court bar the testimony of Mickie W. McComb, Plaintiff's liability expert, and preclude McComb's testimony regarding any of the issues and conclusions set forth in the report of January 5, 2023.

Respectfully submitted,

**HOLSTEN ASSOCIATES, P.C.**

**BY:**    <u>**RPD2724**</u>
         **ROBERT P. DIDOMENICIS, ESQUIRE**
         **Attorney ID No. 30482**
         **115 N. Jackson Street**
         **Media, PA  19063**
         **(610) 566-7583**
         **rdidomenicis@holstenassoc.com**
         **Attorney for the Radnor Individual Defendants**

## <u>CERTIFICATE OF SERVICE</u>

I, Robert P. DiDomenicis, Esquire, counsel for the Radnor Individual Defendants, state that a true and correct copy of the Motion to Preclude the Testimony of Mickie W. McComb and its supporting Memorandum of Law were served upon the following individuals via electronically or U.S. Mail, postage prepaid, this 8th day of March, 2023.

J. Michael Considine, Jr.
J. Michael Considine, JR PC
1845 Walnut Street, Suite 1199
Philadelphia, PA  19103

Anthony S. Pinnie, Esquire
334 W. Front Street
Media, PA  19063
(Attorney for Defendants, Rachel and Justin Ridgeway)

Robert J. Cosgrove, Esquire
Erin Gallagher, Esquire
Wade Clark Mulcahy, LLP
1515 Market Street, Suite 2050
Philadelphia, Pa  19102
(Attorney for Defendant, Bryn Mawr Fire Company
(Attorney for Defendants, Rachel and Justin Ridgeway)

Respectfully submitted,
**HOLSTEN ASSOCIATES, P.C.**

**RPD2724**
**ROBERT P. DiDOMENICIS, ESQUIRE**
**Attorney ID No. 30482**
**115 N. Jackson Street**
**Media, PA  19063**
**(610) 566-7583**
**rdidomenicis@holstenassoc.com**
**Attorney for Radnor Individual Defendants**

7

# EXHIBIT R1

# Mickie W. McComb, Ret. NJSP

1 Klains Lane
Marmora, NJ 08223
(609)703-7597
mickiemccomb@gmail.com

January 5, 2023

J. Michael Considine Jr., P. C.
A Professional Corporation for the Practice of Law
1845 Walnut Street, Suite 1199
Philadelphia, PA 19103

**RE:   Hamilton v. Radnor Township, No. 19- CV-2599**

Dear Mr. J. Michael Considine Jr.

At your request regarding the above captioned case, I, Mickie W. McComb, have prepared this report setting forth my opinions based on my education, law enforcement training, police practices, firearms, and use of force expertise.

## I. <u>INTRODUCTION</u>

The following report is an analysis of the incident involving Radnor Township Police Officer Patrick Lacey #80 and the Plaintiff, Karimu Hamilton. The incident occurred on June 11, 2019, 105 Garrett Avenue, Bryn Mawr, Pennsylvania.

All expert opinions in this report are based upon my review of those listed items, as well as my knowledge, experience, and training in the field of law enforcement and are rendered to a reasonable degree of professional certainty based upon relevant standards and the practices and procedures utilized in the law enforcement community.

## II. <u>METHODOLOGY</u>

In developing my opinions, I have reviewed the provided case specific materials, which occurred on June 11, 2019, at 105 Garrett Avenue, Bryn Mar, Pennsylvania. The materials reviewed were those typically relied upon when conducting an

1

analysis of policing and law enforcement issues. Similar material would be employed by other experts in my field when rendering an opinion. My analysis and conclusions are based upon professional standards, practices, principles, judicial guidance, and protocols recognized, relied upon, and employed in policing and the law enforcement profession.   In forming my opinions, I have relied upon the totality of case material, my specialized training, experiences, and instruction over the entire course of my professional career.   Each opinion is offered within a reasonable degree of professional certainty.

## III. **SYNOPSIS OF EVENT**

On June 11, 2019, the Plaintiff, Karimu Hamilton stated she was in the front of her yard trimming her evergreen bush. Ms. Hamilton explained she had borrowed the tool from a neighbor, who lived on Conestoga Avenue. Once she was finished with the tool, she placed the tool in a cart and was in the process of returning the tool, when she encountered an undercover officer. The officer instructed her to freeze, pointed their firearm at her, and requested backup. Ms. Hamilton stated the officer, later identified as Officer Lacey, advised her that a person had alleged that Hamilton had attempted to attack an individual with a knife.

Ms. Hamilton reported that Officer Lacey pointed the firearm at her for approximately six minutes. Ms. Hamilton expressed she was holding gardening clippers in her hand and dropped them once Officer Lacey instructed her to do so. Ms. Hamilton advised that Officer Lacey continued to point his firearm at her until backup officers arrived. Ms. Hamilton advised that she was not placed in handcuffs and that officers told her that Superintendent Flanagan was on his way. Ms. Hamilton noted that she was detained approximately thirty to forty minutes prior to Superintendent Flanagan's arrival and an additional fifteen minutes once Flanagan arrived. After speaking with Superintendent Flanagan, he advised Hamilton that she was free to leave and was not charged with any criminal violations.

## IV. **SCOPE OF OPINIONS**

All expert opinions in this report are based on my review of the items listed in Exhibit B, in addition to my knowledge, experience, and training in the field of law enforcement. Each opinion is rendered to a reasonable degree of professional certainty relying upon relevant standards and the practices and procedures utilized in the law enforcement community.

I have refrained from rendering an opinion that discusses any legal conclusions or legal standards beyond describing any legal standards that may pertain to the accepted police training, practice, and procedure applicable in this case.

## V. MATERIALS REVIEWED

Pursuant to your request, I have received the following materials related to the above titled matter. I have reviewed the documents forwarded to me by Mr. J. Michael Considine, Jr., P.C., 1845 Walnut Street Suite 1199, Philadelphia, Pennsylvania 19103. Attached to this report is a list of all documents, reports, and surveillance video clips that were forwarded for my analysis in preparation for this report. A complete list of materials reviewed is attached to this report as "Exhibit B."

## VI. EDUCATION, TRAINING AND EXPERIENCE

I am a retired New Jersey State Trooper Sergeant First Class with 25 years' experience and training. During my career with the New Jersey State Police, I acquired substantial experience, knowledge, and developed significant expertise in conducting motor vehicle stops, police investigations, pedestrian contacts, encountering speakers in public areas, and I have had experience in determining whether to arrest someone for free speech activity in public areas. My assignments included working as a Road Trooper for nine years, and as an undercover detective for four years. I trained State Troopers at the New Jersey State Police Training Bureau for nine years in the area of law enforcement, search and seizure, firearms, self-defense, handcuffing, use of force, and police practices, policies, and procedures.

As a result of my experience in law enforcement with police policies, practices, and procedures I gained extensive personal knowledge of the proper methods of police officer training, and appropriate methods of implementing policies and procedures to direct and guide individual officers in the effective performance of their duties.

I am currently employed as an independent consultant and expert witness in litigation involving police officers. In this capacity, as well as my previous employment with the New Jersey State Police, I have reviewed numerous cases involving alleged police misconduct, both for plaintiffs' and defendants' counsel. In such cases, I have evaluated various factors to determine if the conduct of law enforcement personnel or agencies involved in the case violated legal, ethical or

constitutional standards of conduct. Those factors include but are not limited to: the conduct of individual law enforcement officers, the adequacy of the training and supervision received by 2 such officers, and the adequacy and appropriateness of police department policies and procedures.

My relevant training, experience, educational background, court and depositions experience as explained herein is set forth in the Resume/Curriculum Vitae attached to this Affidavit as "Exhibit A."

## VII. <u>RELEVANT STANDARDS</u>

**Graham v. Connor, 1989, In Relevant Part States:**

In 1989, the United States Supreme Court decided the case Graham v. Connor. The case made clear the standard for an officer's use of force upon a "seized free person" whether the force was "objectively reasonable" under the Fourth Amendment. Under the objective reasonableness standard an officer may use the amount of force that is "objectively reasonable" and only applies to the use of force upon a "free seized" person.

Police officers throughout the United States are taught that their use of force will be judged against the "reasonableness standard" established by the United States Supreme Court in Graham v. Connor 1989 and Tennessee v. Garner 1985.
Under the "objective reasonableness" standard an officer may use that amount of force that is "objectively reasonable." The test of reasonableness requires a keen alertness to the facts and the totality of circumstances regarding each specific incident, including:

- Does the suspect pose an immediate threat to officers or others (most important)?
- Is the subject actively resisting arrest?
- Are the circumstances tense, uncertain, and rapidly evolving?
- What is the severity of the crime at issue?
- Is the subject attempting to evade seizure by flight?

## VIII. <u>ANALYSIS OF THE FACTS</u>

Based on my review of the record in this case, I considered the interactions between the Plaintiff, Karimu Hamilton, the Defendant, Radnor Township Police

Officer Lacey, and the events that subsequently took place. The Standards and Analysis narrative is my review of the prevailing law enforcement standards and my observations, impressions, and findings in view of the totality of the material.

It should be noted that some disputed facts exist in this case, and I am not the trier of facts. I will identify those areas of dispute and provide the versions as put forth by the Defendant Officer, the Plaintiff, and other witnesses where relevant and applicable.

**Event Chronology- P1900223128**

**06/11/19**
**11:50:19**
**Event Created-** Subject W/Knife, Location – 32 Garrett Ave.

**06/11/19**
**11:50:19**
**Event Remark –** Neighbor has a saw blade in her hand was being disorderly and making racial comments to the CPLT. Brown skinned B/F LSW Blk Dress///Blue Jean Jacket, Multi-Colored Scarf on her head, Approx Mid 30's, Subject's Name- Karimu Hamilton

**06/11/19**
**11:50:25**
**Event Remark –** Subject lives at 30 Garrett Ave

**06/11/19**
**11:50:38**
**Event Remark -** Walking away on Garrett Twds Conestoga

**06/11/19**
**11:50:46**
**Event Updated -** Total Assigned Units: 1

**06/11/19**
**11:50:48**
**Event Updated -** Total Assigned Units: 2

**06/11/19**
**11:50:55**

5

**Event Updated** – Caller Name- Ridgeway Justin
**06/11/19**
**11:51:13**
**Event Remark** – CPLT has a past history with this neighbor

**06/11/19**
**11:51:36**
**Event Updated:** Total Assigned Units: 3

**06/11/19**
**11:51:42**
**Event Updated:** Total Assigned Units: 4

**06/11/19**
**11:51:42**
**Event Updated** – First Unit Arrived Time: 06/11/19 11:51:46

**Radnor Township Police Department**
**Use of Force Report**
**Incident:** #190008899
**Date:** 6/11/19
**Location:** 105 Garrett Avenue
**Reporting Officer:** Patrick Lacey #80

**Type of Force Reported:** Firearm
**Use of Firearm:** Pointing
**Reason the Use of Force Was Necessary:** To defend self
**Type of resistance: Passive Resistance** (Non-movement resistance by failure to comply with verbal instructions)
**Was the Report Officer Injured:** No
**Officer Response:** Verbal Commands (Describe in Narrative)
**Suspect's Name:** Karimu Hamilton
**Suspect's Clothing Description:** black dress, denim jacket, multi-colored bandana
**Suspect's Weapon's:** Medium sized (14 inch) limb saw

**Officer's Narrative in Relevant Part Stated**

Officer Lacey was dispatched to the area of 32 Garrett Avenue regarding an individual with a knife. The individual was described as a black female, wearing a

6

black dress with a multi-colored scarf on her head. Officer Lacey was at the intersection of Conestoga Road, and Garrett Avenue when he observed the female crossing the street with what appeared to be a weapon in her hand.

Officer Lacey exited his patrol vehicle, removed his handgun to the low ready position, and verbally commanded the female to drop the knife. The female complied with his instructions by immediately dropping the weapon. Officer Lacey reported that he kept his firearm along his side and kicked what he described as a saw away from the female. Officer Lacey holstered his weapon and proceeded with his investigation into the incident.

**Radnor Township Police Department**
**Date: 06/11/2019**
**Incident: #190008925**
**Address: 30 Garrett Avenue**
**Statement: Karimu Hamilton in Relevant Part States:**

Ms. Hamilton stated she has been consistently harassed by her neighbors, the Ridgeway's, since she moved into her residence. Ms. Hamilton reported her neighbors, the Ridgeway's, called the police and alleged that she had attacked Mr. Justin Ridgeway with a knife. Ms. Hamilton stated that she was on her property trimming her evergreen bushes. Ms. Hamilton stated as the result of the complaint, she was approached by the police and almost shot and arrested.

**Karimu Hamilton testified at deposition on November 7, 2022, in Relevant Part**

- Q. On June 11th, 2019, in paragraph 25 you allege that you were using a handsaw to trim an evergreen bush. Do you remember that? (P45, 14-16)
- A. Yes. It wasn't a handsaw. (P45, 17) The type of tool you use it's like clippers. They are like clippers, hedge clippers actually. (P45, 20-21)
- Q. Okay. So, tell me what happened that day. You were doing some gardening and then what happened? (P46, 15-17)
- A. I was cutting my evergreen bush in the front of my house, and I was doing some planting in the front of the house, and I had some extra plants. I also borrowed my tool from the neighbor around the corner. So, once I was done, I packed my tools up and put them in a little cart along with my potted plants, and I was heading to return the tool and also drop off some of the plants. (P46, 18-24 & P47, 1-2)

7

- Q. And where did you have to go to return the tool? (P47, 3-4)
- A. There is a garage around the corner on Conestoga Avenue and so I don't know the name offhand. It's been there forever, and she always helps me out with my gardening tools and stuff like that. So that is where I went. (P47, 5-9)
- Q. So tell me what happened. (P47, 24)
- A. So I was cutting my evergreen bush and trimming it, and as I was walking up the block I was greeted by an undercover cop. He was pointing a gun at me. He told me to freeze. (P48, 1-4) He kind of held me at gun point for a while and called for backup, and then they had explained to me that someone was alleging that I was trying to attack them with a knife. (P48, 9-12)
- Q. Okay. I'm going to read other names to you. You already know Patterson and Racht. How about Lacey? (P49, 6-8)
- A. Oh, Lacey. It's Lacey. Lacey is the one that had the gun in his hand. (P49, 9-10)
- Q. So how long did Officer Lacey hold the gun on you? (P49, 14-15)
- A. A good six minutes. (P49, 19)
- Q. Where was the clippers? Where were they when he stopped you? (P49, 22-23)
- A. In my hand. (P49, 24)
- Q. Did he tell you to drop it? (P50, 1-2)
- A. Yes. (P50, 5)
- Q. Did he holster his gun after you did it? (P50, 6)
- A. No. He had his gun out from the beginning. (P50, 7)
- Q. By the time they arrived, had he put his gun away? (P50, 11-12)
- A. Yes. (P50, 13)
- Q. Very close can mean a lot of different things. Are we talking two-foot, six foot, ten feet? (P51, 1-3)
- A. He was standing on me so to speak. He was very close to me. (P51, 4-5)
- Q. So he didn't put you in handcuffs, did he? (P51, 8-9)
- A. No. (P51, 10)
- Q. Can you tell me about how long you had to wait for Flanagan to get there? (P51, 22-23)
- A. About ten minutes. (P51, 24)
- Q. So what did Superintendent Flanagan say when he showed up? (P52, 1-2)
- A. He said listen, are you going to let us in your house?  And I was like excuse me. He was like okay; we are going to get in your house whether you

let us in your house or not. So, either you are going to let us in your house or I'm going to get an administrative warrant and we are going to come into your house. (P52, 3-9)

- Q. So you had to wait about ten minutes for Flanagan to get there. How long did this discussion with him take place? (P54, 2-4)
- A. About ten minutes, ten to fifteen minutes. (P54, 5)
- Q. So after ten to fifteen minutes of talking and not agreeing to anything what happened? (P54, 6-8)
- A. Well, he said, you know, he said I was free to leave. (P54, 11-12)
- Q. Did I understand that one of the officers took the tools back to your neighbor? (P54, 15-16)
- A. Yes. (P54, 17) I believe it was Gluck. (P54, 19)
- Q. On June 11th, 2019, you said Lacey held a gun at you. How far was the gun from your body when he held it at you? (77, 11-13)
- A. Not far. (P77, 14)
- Q. Did he ask you what you were doing with the hedge clippers? (P77, 15-16)
- A. No. (P77, 17)
- Q. Did you make threats of physical injury to anyone? (P77, 20-21)
- A. No. (P77, 22)
- Q. Did you later find out that Rachel Ridgeway complained that you had a knife and were loose on the street? (P78, 2-4)
- A. I later found out that Rachel Ridgeway called and said that I had threatened him with a knife. (P78, 5-6)
- Q. Did you ever threaten either him or his wife with a knife or any weapon at any time? (P78, 9-10)
- A. No. (P78, 11)
- Q. Did the police even ask if you were threatening anyone with a weapon? (P78, 16-17)
- A. No. (P78, 18)
- Q. Did you feel that you were free to leave at the time they were in your presence? (P79, 1-2)
- A. No. (P79, 3) I was surrounded by police officers so. (P79, 5)
- Q. Did they tell you that you had to stay, to wait? (P79, 10-11)
- A. Yes. They were like you have to wait here because Flanagan is going to come and talk to you, and also, I believe Gluck went to verify the story, like he took the tool around the corner to verify if the story checked out. (P79, 12-16)

- Q. Did they tell you that someone had stated that you were threatening someone with a knife? (P79, 17-18)
- A. At some point I believe Lacey did tell me that. (P79, 19-20)
- Q. From the time you first stopped until the time Flanagan arrived, how much time passed? (P80, 2-3)
- A. It was a solid 30 minutes, 30 to 40 minutes. (P80, 8)
- Q. After Flanagan arrived how much longer were you there at the scene? (P80, 9-10)
- A. A good fifteen minutes. (P80, 11)
- Q. Did Flanagan tell you that you could leave? (P80, 15)
- A. When he was done. When we were done communicating, yes, he did say I was free to leave. (P80, 16-18)
- Q. Did you explain to Flanagan you were not making a threat to anybody? (P80, 19-20)
- A. He didn't even address that. That wasn't what he addressed. He was addressing whether or not I was going to allow them to come into my house. (P80, 21-23)
- Q. Okay. Are you aware of course that the time stamp, you mentioned initially that Lacey, from the time Lacey stopped you until Flanagan arrived was 30 or 40 minutes and then he was there, Flanagan was there for another fifteen minutes with you. Are you aware that those times are recorded on the 911 event chronologically? (P98, 2-9)
- A. Yes. (P98, 10)

**Radnor Township Police Officer Lacey testified at deposition on December 14, 2022, in Relevant Part**

- Q. Before June 11th, 2019, did you ever have any violent encounters with Karimu Hamilton? (P6, 21-22)
- A. No. (P6, 23)
- Q. Had she ever threatened physical injury to anyone? (P6, 24 & P7, 1)
- A. Not that I know of. (P7, 2)
- Q. Did she have a previous criminal record on June 11th, 2019? (P7, 7-8)
- A. I don't know. (P7, 9)
- Q. Did you hear that she was armed and dangerous? (P7, 10)
- A. That day I heard that the subject matching her description had a knife. (P7, 14-15) Police dispatch, Delaware County Dispatch. (P7, 17)
- Q. Did you prepare a report on the June 11th, 2019, incident? (P9, 5-6)

10

- A. Is it the use of force incident, the report? (P9, 7) Okay. Then yes. (P9, 9)
- Q. Is there another report from that date other than this report? (P9, 22-23)
- A. Yes, the police incident report. (P9, 24)
- Q. Who wrote, who wrote this report, this other incident report for the January, excuse me, June 11th, 2019, who wrote that? (P12, 24 & P13, 1-2)
- A. Officer Graves. (P13, 3)
- Q. Did you put in writing what she told you happened that date? (P15, 10-11)
- A. I did not. (P15, 12)
- Q. And you did not interview Karimu Hamilton? (P18, 23)
- A. I talked to her after the fact after she dropped the saw. Yes, I did speak with her. (P19, 2-3)
- Q. You didn't write down her version of what happened in the incident, did you? (P19, 4-5)
- A. It doesn't go on the use of force. That is for the officer's actions only. (P19, 6-7)
- Q. Did any police officer seek to interview Karimu Hamilton to put in writing her version of what happened on June 11th, 2019? (P19, 23-24 & P20, 1)
- A. I don't know. (P20, 2)
- Q. Well, you said that there was passive resistance because she failed to comply with a verbal instruction and you said that instruction was to drop the knife, but in your narrative, you say as I opened the door and exited, I removed my handgun to low ready and verbally commanded her to drop the knife. She immediately dropped the weapon and backed away. Doesn't that seem to indicate that she did comply with your instructions to drop the weapon? (P21, 11-19)
- A. When I told her to drop the knife, she said it's not a knife, it's a saw. I said drop the knife and then she dropped it. (P21, 20-22)
- Q. But she did comply with your instructions immediately, didn't she? (P22, 3-4)
- A. I said drop the knife, she still held it in her hand and said it's not a knife, it's a saw. I said drop the knife, then she stopped it. (P22, 5-7)
- Q. If that's true, why did you say in your report, quote, she immediately dropped the weapon and backed away? (P22, 8-10)
- A. It was about a second so that would be close to immediate and when she dropped it she backed away. (P22, 11-12)

11

- Q. She never threatened you and said she was going to injure you, did she? (P23, 20-21)
- A. No. (P23, 22)
- Q. She never positioned the weapon in a way that made it appear that she was about to use it on you, did she? (P23, 23-24 & P24, 1)
- A. No. (P24, 2)
- She had no history of violence that you're aware of; is that correct? (P24, 3-4)
- A. I don't know if she did or didn't. (P24, 5)
- Q. And when you first saw her how many feet away from you was, she? (P24, 15-16)
- A. 20, 25. (P24, 17)
- Q. And she immediately complied with that order; is that right? (P25, 5-6)
- A. She dropped it after she told me it was not a knife, it was a saw, yes. (P25, 7-8)
- Q. And you pulled a gun on her; is that correct? (P25, 9)
- A. I pulled my weapon out. I didn't pull it on her. (P25, 10-11)
- Q. Was it pointed at her? (P25, 14)
- A. No. It was in the position we call low ready. (P25, 15)
- Q. Well, in your report, use of firearm, you checked this box that says pointing. (P25, 16-17)
- A. Yes. I was pointing my gun out of my holster in the low ready position. (P25, 18-19)
- Q. Well, if that's true why did you check in the report that says pointing? Doesn't that indicate pointing at a person? (P26, 3-5)
- A. No. (P26, 6)
- Q. So you have to do a use of force report any time the gun is no longer in a holster even if it's not pointed at anyone? (P26, 7-9)
- A. It wouldn't, the gun would never be out of the holster just for no reason. (P26, 10-11)
- Q. Would it have been relevant if she had been known to be violent in the past and had violent encounters with the police? Would that be something you'd want to know about in determining what kind of force might be necessary? (P27, 7-11)
- A. I guess it would be good to know, but not if she was just walking down the street pushing a cart, it wouldn't matter. (P27, 12-14)

12

- Q. When you first saw Karimu was, she making any threats or using this saw in a way that appeared to you to be putting someone in danger of physical injury? (P28, 7-9)
- A. No. (P28, 10)
- Q. And did you feel that you were in physical danger that she was about to physically injure you with it? (P28, 17-19)
- A. No. (P28, 20)
- Q. Is it true that you're required to communicate in a situation to try to avoid using force and to use it only when reasonable efforts to communicate without use of force are unsuccessful or impracticable? (P29, 5-8)
- A. Yeah, we go by what the policy says, yeah, of course. We're not looking to use force if not necessary. (P29, 9-11)
- Q. So if you ordered her to drop this limb saw and she did it immediately, then why was any of use of force, even taking your gun out necessary? (P29, 12-14)
- A. She dropped it after I asked her to drop the knife which she said was a saw and then dropped it, so I used the appropriate amount of force that was necessary for the weapon that she had. (P29, 15-18)
- Q. Did you ever hear that she had put anyone else other than you in danger of imminent physical danger that day? (P29, 23-24 & P30, 1)
- A. I believe the way the call came in was that she threatened her neighbors with a knife. I believe that was what the dispatch was. (P30, 2-4)
- Q. Karimu Hamilton never attempted to escape, did she? (P31, 1-2)
- A. She was never in custody. (P31, 3)
- Q. How long was she at the scene? (P31, 12)
- A. 15 minutes maybe. (P31, 13)
- Q. And how long did you have the gun out? (P31, 14)
- A. Five seconds, six seconds. (P31, 15)
- Q. If she immediately dropped the weapon after you told her to, why did the incident have to take 15 minutes? (P31, 16-18)
- A. That I don't know. She dropped the weapon. I asked her if she could just have a seat on the curb until we figure out what's going on with the other half and that's how that went. The incident between me and her lasted 17 seconds, so as far as the other you have to ask the other officers that. (P31, 19-24)
- Q. But you didn't tell her she was free to leave; is that correct? (P34, 18-19)
- A. I never, that exact statement, no, I never said that. (P34, 20-21)

13

- Q. So you're an armed officer who brought out your gun and now you're asking her to have a seat. Isn't that requiring her to be detained even if it's briefly? (P35, 22-24)
- A. It's not, I'm not requiring her to do anything. I just asked her if she could have a seat until we figure out what's going on. (P36, 1-3)
- Q. Why did you need her, to make her have a seat? You already determined that she dropped the weapon right away, she didn't resist. Why wasn't she free to leave right away? (P36, 4-7)
- A. I needed to figure out what was going on with the incident. It wasn't just let me stop somebody walking down the street and then say have a good day. She was involved, she was part of an incident that was taking place. She was not detained. She was never placed under arrest. I just said could you do me a favor, have a seat until the other officers get down here and we figure out what's happening. (P36, 8-15)
- Q. So if you pointed a gun at someone that would not be considered deadly force; is that right? (P40, 2-3)
- A. Not if they didn't die. (P40, 4)
- Q. Isn't deadly force more speaking to the type of weapon used and not necessarily the result of what occurs? (P40, 5-7)
- A. No. Well, yes, a gun obviously would be considered if used deadly force. (P40, 10-11)
- Q. How long did it take, after you saw her, put down the tool, whenever it was, how long did it take to investigate to determine whether she had committed a crime that day? (P49, 10-13)
- A. I just had to wait until the officers that were at the house could make that determination. I was focused on when I stopped Ms. Hamilton and then the officers at the house, that was completely separate from me and when they came down, we figured it out. I don't know the exact time. I would say not long, but I couldn't give you an exact, couple of minutes maybe. (P49, 14-20)
- Q. So then a couple more minutes passed and that happened, and did you tell Karimu Hamilton after those couple minutes had passed that she was free to leave? (P50, 5-7)
- A. No, I told her that if she could, asked if they could have a seat until we figure out what happened. (P50, 8-9)
- Q. And he asked her whether she would allow them to look in her house so that they could inspect for code violations; isn't that correct? (P50, 15-17)
- A. I believe it was reference to the code issues, yes. (P50, 18-19)

14

- Q. She stated that she was told by the police she had to stay so she was obeying the police and then Officer Flanagan asked her if she would allow the police to get into her property. Is that what you observed? (P51, 13-17)
- A. Yes. She was asked to stay, and she did speak to Chief Flanagan. I did not ask her to stay. (P51, 18-19)

## IX. SUMMARY OF EXPERT OPINIONS

**1. The Defendant Officer Lacey of the Radnor Police Department use of force; specifically, pointing a loaded firearm at the Plaintiff, Karimu Hamilton was not objectively reasonable.**

By statute law and when necessary, law enforcement officers have the right to use force in response to resistance or aggression. Use of force is the verbal and /or physical action an officer may take to attain and maintain control of a situation or incident, which requires lawful intervention. The degree of force used is dependent upon the amount of resistance or threat to the safety of the public or the officer. Control is reached when a person complies with the officer's demands, or the person is restrained or apprehended. The officer must be prepared to utilize the force options that are reasonable for the circumstances, including the possibility of force de-escalation when appropriate.

The reasonableness inquiry in an excessive force case is objective, and for purposes of this case, includes was the force used by Radnor Township Police Officer Lacey concerning the incident involving the Plaintiff, Karimu Hamilton, objectively reasonable and necessary considering the totality of the circumstances on June 11, 2019.

In 1989, the United States Supreme Court decided the case Graham v. Connor. The case made clear the standard for an officer's use of force upon a "seized free person" whether the force was "objectively reasonable" under the Fourth Amendment. Under the objective reasonableness standard an officer may use the amount of force that is "objectively reasonable" and only applies to the use of force upon a "free seized" person.

Police officers throughout the United States are taught that their use of force will be judged against the "reasonableness standard" established by the United States Supreme Court in Graham v. Connor 1989 and Tennessee v. Garner 1985. Under the "objective reasonableness" standard an officer may use that amount of force

15

that is "objectively reasonable." The test of reasonableness requires a keen alertness to the facts and the totality of circumstances regarding each specific incident, including:

- Does the suspect pose an immediate threat to officers or others (most important)?
- Is the subject actively resisting arrest?
- Are the circumstances tense, uncertain, and rapidly evolving?
- What is the severity of the crime at issue?
- Is the subject attempting to evade seizure by flight?

When analyzing the use of force in this incident, it must be noted variations of the incident put forth are offered by Plaintiff Karimu Hamilton and Defendant Officer Lacey.

In this matter, the Plaintiff, Karimu Hamilton, stated contrasting and conflicting versions of the account from that given by Officer Lacey, representing the Radnor Township Police Department (see Use of Force Report ##190008899).

In deposition, Karimu Hamilton stated she was returning a gardening tool, described as hedge clippers to a neighbor located on Conestoga Avenue, when she encountered an undercover officer, later identified as Officer Patrick Lacey. Ms. Hamilton testified that Officer Lacey instructed her to freeze and pointed his firearm at her for approximately six minutes even after she complied with his request to drop the weapon until backup officers arrived. Ms. Hamilton testified Officer Lacey was close to her when pointing his weapon and affirmed she did not threaten anyone with physical injury. Moreover, Ms. Hamilton testified Officer Gluck assumed possession of the gardening tool, returned it to its owner, and verified the account of the event as described by Hamilton.

In deposition, Officer Lacey testified he observed Karimu Hamilton approximately 20-25 feet from him with a weapon, possibly a knife. Officer Lacey testified that Hamilton never threatened him with the weapon. He assumed Hamilton was not going to physically injure him and that Hamilton was not yielding the weapon in any menacing manner. Officer Lacey affirmed that Hamilton immediately complied with his instructions to drop the weapon, which was identified as a saw.

Furthermore, Officer Lacey testified that when he withdrew his firearm from his holster, he pointed the firearm in the low ready position and not at Hamilton.

16

Officer Lacey's Use of Force Report #190008899 indicated Plaintiff Hamilton offered passive resistance. Officer Lacey responded by pointing his firearm at Hamilton to defend himself. However, within the narrative portion of Officer Lacey's report, he indicated he removed his firearm from his holster and assumed a low ready position. Officer Lacey instructed Hamilton to drop the weapon, which he described as a knife. Officer Lacey reported that Hamilton immediately dropped the weapon and backed away. Officer Lacey reported he kept his weapon at his side in the low ready position, kicked the weapon away from Hamilton, and holstered his weapon.

It is my professional opinion that Officer Lacey's Use of Force Report offered two completely contrasting versions of the event. The top portion of the report indicated the following:

**Type of Force Required**
- Firearm

**Use of Firearm**
- Pointing

**Reason the Use of Force was Necessary**
- To defend self

**Type of resistance Encountered by Officer**
- Passive Resistance (Non-movement resistance by failure to comply with verbal instructions)

**The Officer's Narrative documented:**

- Removed handgun to the low ready position.
- Verbally instructed her to drop the knife. She immediately dropped the weapon and backed away.
- Firearm remained out and he kicked the weapon identified as a saw away from Hamilton.
- Holstered his weapon and continued his investigation.

Throughout my training and experience as a New Jersey State Trooper as well as an Academy Firearms Instructor, and Assistant-Unit Head, Firearms and Self-

Defense Training Unit, Training Bureau, Sea Girt, New Jersey, the low ready position is assumed when an officer draws their weapon and places the firearm in a downward position away from their target. In comparison, officers are taught that pointing a firearm indicates an officer's weapon is drawn and pointed-up at their target.

Police officers are taught throughout their career, beginning at the academy level through their annual firearm's re-qualification course, the differences between assuming the low ready position and pointing a firearm at their target. These firearms positions are explained within the training classroom portion as well as the practical application of the members participating during the firearm's re-qualification on an annual or bi-annual basis. It is reasonable to believe that an officer, such as Officer Lacey, understood the difference between assuming the low ready position with a firearm and pointing a firearm.

It is my professional opinion that Radnor Township Police Officer Lacey's use of force was not objectively reasonable during his interaction with Plaintiff Karimu Hamilton on June 11, 2019. A reasonably prudent and well-trained police officer confronted with a similar situation would not have reacted similarly.

Furthermore, in Baker v. Monroe Township, 50 F. 3rd 1186 (3rd Cir. 1995), the Plaintiffs approached the home of a friend where a police drug raid was underway. When they came to the door police yelled "get down," pointed guns at them, handcuffed them for as long as 25 minutes. After they identified themselves as relatives police released them. Id, 1188-1189. There is no per se rule about the length of time suspect may be detained before the detention becomes a full-scale arrest. The court must examine the reasonableness of the detention, particularly whether the police were diligent in accomplishing the purpose of the stop as rapidly as possible. The Bakers claim they were detained 10 minutes outside and 15 minutes inside. It took a minute of two to secure the house. Police could not sort out who was who in the first ten minutes. Such a detention itself does not necessarily violate the 4th Amendment. Id, 1191-1192. Use of guns must be justified by the circumstances. Use of guns and the length of the detention shows a very substantial invasion of the Plaintiff's personal security. Police had no reason to feel threatened by Plaintiffs or fear their escape. It appeared they were making a social visit. There is no evidence that should have caused the officers to use the kind of force used. If another officer authorized or acquiesced in the use of guns, even though he did not use them himself, this may violate the 4th Amendment. Armstrong's hollering to bring them in and their being in handcuffs for ten

18

minutes, five minutes after Armstrong returned, where he could see them, indicates he acquiesced. SJ for him was improper. Id, 1193-1194.

It is my professional opinion the use of force; specifically, pointing a firearm at the Plaintiff, was not objectively reasonable and inconsistent with accepted police practices and training, as well as the legal standards governing the reasonable use of force, which were articulated by the United States Supreme Court in Graham v. Connor, 1989.

## 2. The detention of the Plaintiff, Karimu Hamilton, by Officer Patrick Lacey #80 was unreasonable and constituted false arrest.

On June 11, 2019, Plaintiff Karimu Hamilton was in her front yard trimming an evergreen bush with a pair of hedge clippers. Ms. Hamilton had borrowed the tool from a neighbor, who lived on Conestoga Avenue. Once she was finished with the tool, she placed the tool in a cart and was in the process of returning the tool, when she encountered an undercover officer, later identified as Officer Patrick Lacey. Officer Lacey instructed her to freeze, pointed his firearm at her, and requested backup. Officer Lacey continued to detain Ms. Hamilton at gun point for approximately six minutes even after she complied with his request to drop the weapon until backup officers arrived.

Superintendent Flanagan was requested to respond to the scene by officers and did so ten minutes later. Superintendent Flanagan detained Hamilton and questioned Hamilton for approximately ten to fifteen minutes regarding an ongoing issue concerning her residence. Upon conclusion of their discussion, Superintendent Flanagan instructed Hamilton that she was free to leave.

The United States Supreme Court has long held that officer(s) have the right to briefly detain and investigate a person when the officer has reasonable suspicion to believe that the person is involved in criminal activity. Reasonable belief is the legal standard by which a police officer has the right to briefly detain a suspect for investigatory purposes. The reasonable belief standard requires facts or circumstances that would lead a reasonable officer to believe that a suspect has committed, will commit, or is committing a crime. Once a lawful stop is made, a law enforcement officer's suspicions may increase, the detention will be prolonged, and the scope will be enlarged. If the law enforcement officer's suspicions are diminished or eliminated, the detention will be terminated.

Investigative Detention: Is the temporary detention of a person for investigative purposes, based on a reasonable belief that the person has committed, is committing, or is about to commit a crime, under circumstances that do not amount to probable cause for arrest.

According to deposition testimony provided by Hamilton, she was initially held at gunpoint by Officer Lacey for approximately six minutes. Ms. Hamilton testified that officers instructed her that she was not free to leave, and she was surrounded by police officers. Ms. Hamilton advised that she was not placed in handcuffs and that officers told her that Superintendent Flanagan was on his way. Subsequently, Officer Gluck assumed possession of the gardening tool, returned it to its owner, and verified the account of the event as described by Hamilton.

Ms. Hamilton testified from the time she was initially stopped until the time Superintendent Flanagan arrived, thirty to forty minutes had elapsed. Ms. Hamilton further testified that she spoke with Superintendent Flanagan for approximately fifteen minutes before Flanagan instructed her that she was free to leave. Ms. Hamilton was not charged with any criminal violations.

Officer Lacey testified in deposition he did not inform Karimu Hamilton that she was free to leave the scene. Officer Lacey stated he requested Hamilton to be seated on the curb until police were able to understand what had transpired. Officer Lacey affirmed that members of the police department instructed Hamilton to remain on scene to speak with Chief Flanagan pertaining to an unrelated issue regarding her personal residence.

Furthermore, in U.S. v. Givan, 320 F. 3rd 452, 458 (3rd Cir. 2003), the district court denied Torrence's motion to suppress as evidence the heroin obtained from the vehicle search. The court based its decision on its findings that (1) the troopers had probable cause to charge Torrence with speeding; (2) the troopers had a reasonable suspicion to believe that Torrence had committed a crime justifying further investigation; (3) Torrence freely and unqualifiedly gave consent to the troopers to search the vehicle. We "review the district court's denial of the motion to suppress for `clear error as to the underlying facts, but exercise plenary review as to its legality in light of the court's properly found facts.'" *United States v. Riddick,*156 F.3d 505, 509 (3d Cir. 1998) (quoting *United States v. Inigo,*925 F.2d 641, 656 (3d Cir. 1991)).

Neither defendant contests the district court's first ruling that the initial stop clearly was justified in as much as Taylor clocked the vehicle at 77 miles per hour in a 65 miles per hour zone. After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation. *See United States v. Johnson,*285 F.3d 744, 749 (8th Cir. 2002). While "reasonable suspicion" must be more than an inchoate "hunch," the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop. *See United States v. Sokolow,*490 U.S. 1, 13, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). In determining whether there was a basis for reasonable suspicion, a court must consider the totality of the circumstances, in light of the officer's experience. *See United States v. Arvizu,*534 U.S. 266, 273, 122 S.Ct. 744, 750-51, 151 L.Ed.2d 740 (2002); *United States v. Orsolini,*300 F.3d 724, 728 (6th Cir. 2002). Within the last year we have noted that in "the Supreme Court's most recent pronouncement on the Fourth Amendment reasonable suspicion standard, it accorded great deference to the officer's knowledge of the nature and the nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." *United States v. Nelson,*284 F.3d 4 (3ʳᵈ Cir. 2022).

Even assuming, as the district court seemed to do, that the brief questioning following the return of Torrence's documents occurred while Torrence had been seized for Fourth Amendment purposes rather than during a consensual encounter that began once Torrence's documents were returned and he was informed that he was free to leave, Taylor had a reasonable and articulable suspicion of illegal activity sufficient to extend the stop the few additional minutes it took to ask the occupants about their travel destinations. Taylor knew at that time that: (a) Torrence had been speeding; (b) Torrence was operating a motor vehicle that had been rented less than 24 hours earlier in Saginaw, Michigan; (c) the estimated driving time from Saginaw to New York City and back to the site of arrest was approximately 17 hours; (d) it is a common practice of drug dealers from other states to make a non-stop trip to New York City and back for purchasing drugs; (e) Torrence appeared nervous and fidgety and was talking often and shuffling his feet. Furthermore, questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop. *See United States v. Williams,*271 F.3d 1262, 1267 (10th Cir. 2001). After receiving conflicting stories from Torrence and the passengers about their travel, Taylor was justified in further extending the stop and asking for consent to search the vehicle. Thus, the district court did not err in holding that the further investigation was justified.

21

In <u>llinois v. Caballes</u>, 543 U.S. 405 (2005), was a decision by the <u>Supreme Court of the United States</u> in which the Court held, 6–2, that the use of a <u>drug-sniffing police dog</u> during a routine traffic stop did not violate the <u>Fourth Amendment</u>, even if the initial infraction is unrelated to drug offenses.

In the case, Illinois native Roy Caballes was charged with <u>narcotics trafficking</u> after an <u>Illinois State Police</u> officer used a police dog to uncover <u>marijuana</u> in the trunk of his car during a routine traffic stop for speeding. Caballes tried to <u>suppress</u> the evidence found from the police dog search, arguing that the use of the dog during a routine traffic stop violated the Fourth Amendment's prohibition of unreasonable search and seizure. Justice <u>John Paul Stevens</u> wrote for the six-justice majority that it was not an overstep of police power to use a police dog during a routine traffic stop, because a well-trained police dog will only alert to the presence of illegal substances that no citizen has the right to possess. Chief Justice <u>William Rehnquist</u> took no part in the consideration of this case, and did not author an opinion.

The ruling relied on a previous decision, <u>*United States v. Place*</u> (1983), in which the Court upheld the constitutionality of police dog searches, and affirmed that police do not have to have <u>reasonable suspicion</u> to bring a canine near a person's belongings in a public place. In response to *Caballes*, the Court clarified in <u>*Rodriguez v. United States*</u> (2015) that an officer may not unreasonably prolong the duration of a traffic stop to conduct a dog sniff.

It is my professional opinion that the temporary detention of Karimu Hamilton by Officer Lacey and the Radnor Township Police Department on June 11, 2019, was unreasonable, constituted false arrest, and violated accepted police practices, policies, procedures, and training. According to all accounts Ms. Hamilton was surrounded by police officers and instructed that she was not free to leave and that she was required to speak with Superintendent Flanagan. Ms. Hamilton was not charged with any criminal violations.

## X. <u>CONCLUSIONS</u>

All opinions contained in this report are based on my review of those listed items, as well as my knowledge, experience, and training in the field of law enforcement, and are rendered to a reasonable degree of professional certainty based on the above noted standards, practices, and procedures utilized in the law enforcement community and the manner in which they are trained.

Upon completion of reviewing the materials, documents, provided to me by counsel for the Plaintiff, it is highly probable and can be stated within a reasonable

degree of professional certainty that the Defendant Officer Patrick Lacey #80 use of force, specifically pointing a firearm at the Plaintiff was not objectively reasonable and the temporary detention was unreasonable and constituted false arrest.

It is my professional opinion that Officer Lacey's actions were not consistent and violated accepted police practices, policies, procedures, and training, as well as the legal standards governing the reasonable use of force, which were articulated by the United States Supreme Court in Graham v. Connor, 1989.

My relevant training, experience, educational background, court, and depositions experience as explained herein is set forth in the resume/Curriculum Vitae attached to this Affidavit as "Exhibit A."

I declare that the information contained in this report is my work product and is true to my best knowledge and information. All conclusions have been rendered to a reasonable degree of certainty. My analysis and conclusions are based on the information made available to me. I reserve the right to amend my opinions as expressed in this report when or if further facts, materials, reports, and any other evidence are submitted or presented for my review.

Sincerely,
/s/ Mickie W. McComb

Mickie W McComb, Ret. NJSP

# EXHIBIT R2

Exhibit "A"

# CURRICULUM VITAE
# MICKIE MCCOMB

1 Klains Lane                                          Cell: 609.703.7597
Marmora, NJ 08223                          Email: mickiemccomb@gmail.com

**PROFILE**

New Jersey State Trooper Sergeant First Class (Retired) with 25years experience including Office of Professional Standards, academy instructor, Intelligence Bureau (Homeland Security), Division of Gaming Enforcement (DGE) undercover detective and road duty trooper. Extensive experience in law enforcement training, firearms, self-defense, empty hand, edged weapons, baton, blunt impact weapons, oleoresin capsicum spray, handcuffing, less than lethal, physical training, use of force, court testimony, police practices, procedures, and training, internal affairs, vehicle pursuit policies, practices, and procedures, administration, and management development.

**EDUCATION**

Saint Joseph's University, Philadelphia, PA
M.S. Criminal Justice, January 1996

Seton Hall University, South Orange, NJ
B.A. Communications, June 1980

**PROFESSIONAL EXPERIENCE**

24

*New Jersey State Police State Troopers Fraternal Association and*                2021 - Consultant
*National Troopers Coalition*
- Use of Force, Police Practices, Policies, and Procedures Expert
- Police Reform Project- New Jersey & Nationally- Use of Force,
  Choke holds, and Training.

*New Jersey State Police State Troopers Fraternal Association*                2020- Consultant

- Use of Force, Police Procedures and Policy Expert

*The TASA Group*
- Use of Force Expert                2014 - Consultant

*Cape May Co. Police Academy, Cape May, NJ*
- Use of Force Instructor                2014- 2016

*Mercer Co. Police Academy, Mercer Co., NJ*
- *Defensive Tactics and Use of Force Instructor*                2013- Present

*Ocean City High School, Ocean City, NJ*                2013-2019
- Security Aid Supervisor
- Investigate and prevent illegal drug use.
- Investigate and collaborate with Ocean City Police Department in the investigation of narcotic
  defenses

*New Jersey State Police Office of Professional Standards, Cherry Hill, NJ*        2012- 2013
- Responsible for supervising personnel and conducting internal investigations of alleged
  misconduct involving, search and seizure, motor vehicle stops, narcotics, gambling, and police
  policies and procedures.
- Provide use of force testimony and conducted independent investigations (UOF)
- Conduct review of allegations regarding excessive use of force
- Served as consultant for the Risk Management Advisory Panel Meetings concerning use of force
  among New Jersey State Police members
- Revised S.O.P. B-22 Use of Force Policy and Annex A-Reportable Use of Force

*New Jersey State Police Training Academy Bureau, Sea Girt, NJ*            2003-2012
- Assistant Unit Head of Firearms and Self Defense Training Unit - Recruit and in-service training
  programs including but not limited to: Firearms, self-defense tactics, baton, OC spray,
  handcuffing, and pursuit policies, practices, and procedures etc.
- Evaluated cadet performance levels and recommended augmentations or dismissals
- Instructed self-defense, baton, and firearms training to recruit personnel
- Instructed advanced self-defense and firearms training to enlisted members
- Best Practices Self-Defense Project – Researched, conducted, analyzed, and developed NJSP
  defensive tactics program based on Federal, State, and local agency standards
- Authored and revised New Jersey State Police defensive tactics lesson plans
- Integral participant in the integration of a seamless transition from defensive and close-quarters
  combat tactics to firearms utilizing force options

- Developed and conducted self-defense training seminars for: Office of Attorney General, Consumer Affairs Bureau, Division of Gaming Enforcement, and Department of Parole
- State of New Jersey Defensive Tactics Training Committee - Focus group consisted of representatives of the Attorney General's Office, Department of Criminal Justice, Department of Parole, municipal agencies, and state police
- Trooper/Trainee Active Countermeasures Training Evaluation, Texas Department of Public Safety, 2006, Richard Miller M.D., reviewed procedures, protocols, instructor certifications, video footage, and recommended changes to program following death of trainee from incident on May 19, 2005
- Executive Management Unit responsible for authoring lesson plans, survey members, data collection and analysis, and instructed first line supervision course
- Academy instructor encompassing the first subject matters concerning recruit and in-service training

*Intelligence Bureau (Homeland Security)*                    2001-2002
- Created strategic emergency security plans following 9/11 for New Jersey State Police

*Undercover Detective Division of Gaming*                    1997-2001
- Assigned to New Jersey State Police Division of Gaming Enforcement.  Investigated Atlantic City casino crimes involving cheating, thefts, financial crimes, money laundering, prostitution, counterfeiting, narcotics trafficking, credit card fraud, and assaults.

*Road Trooper*                    1988-1997
- Assigned to Troop "A" station region, investigating all police related activities, criminal complaints, motor vehicle accidents, MV stops, DWI, narcotics investigations, and criminal arrests. Received continual training involving search and seizure, narcotics, criminal law, motor vehicle, firearms, and use of force.

*Academy Training*                    1988
- New Jersey State Police Training Academy, Sea Girt, New Jersey

*Trump Plaza Hotel & Casino, Atlantic City, NJ*                    1984-1988
- Casino gaming dealer, supervisor involving craps, blackjack, and roulette

*Resorts Hotel & Casino, Atlantic City, NJ*                    1982-1984
- Casino gaming dealer

**CASES – EXPERT WITNESS TESTIMONY/OPINION**

- Expert Excessive Use of Force, Retained 2022, Circuit Court of Harrison County Mississippi, Second Judicial District
- Expert Excessive Use of Force, Retained 2022, United States District Court District for the Eastern District of Pennsylvania
- Expert Self-Defense/Defensive Tactics, Retained 2022, State of New York and Local Employees Retirement Systems, Kailynn Keeler v. State of New York.
- Expert Excessive Use of Force, Retained 2022, United States District Court District of New Jersey Camden Vicinage
- Expert Excessive Use of Force, retained 2022, United States District Court Northern District of New York, Foskey v. Corrections Officers Daniel Paige, Connor Irish, and Teudy Nuesi

26

- Expert Excessive Use of Force, Retained 2022, United States District Court of New Jersey, Eckert v. Atlantic County Justice Facility et., al
- Expert Excessive Use of Force, Retained 2022, United States District Court of New Jersey, Estate of Jacob Servais v. Caccia, et al
- Expert False Arrest and Failure to Train, Retained 2022, United States District Court for the Eastern District of Pennsylvania, Grant v. The City of Philadelphia, Emile Sauris and Steven Moffitt et.al
- Expert Excessive Use of Force and Failure to Train, Retained 2022, United States District Court Western District of North Carolina, Estate of Craven v. Officers Christopher Novelli and Alexander Arndt
- Expert Excessive use of Force and False Reports, Retained 2022, Administrative Law Judge of New Jersey, State v. Eckert
- Expert Impact Weapons, Retained 2022, Common Pleas of Northampton County, Pennsylvania, Gaines v. Commonwealth of Pennsylvania (Criminal Case)
- Expert Use of Force, Firearms, and Terroristic Threats, Retained 2022, Superior Court of New Jersey, State v. Hassan (Criminal Case)
- Expert Use of Force Self-Defense, Retained 2022, District Court of Minnesota, State of Minnesota v. Keenan (Criminal Case)
- Expert Excessive Use of Force -Self-Defense, Retained 2022, Court of Common Pleas of Leigh County, Pennsylvania, Wilfredo Gonzalez v. Chicago Sports Bar & Gravity
- Expert Simple Assault, and Disorderly Person, Retained 2022, Municipal Court and Administrative Law Judge of New Jersey, State v. Lucia (Criminal Case)
- Expert Excessive Use of Force and Civil Rights Violation, Retained 2022, United States District Court of New Jersey, United States v. Delahanty
- Expert Excessive Use of Force, False Imprisonment, and False Arrest, Retained 2022, United States District Court of New Jersey.
- Expert Police Policies and Procedures, Failure to Train, Search and Seizure, Retained 2021, United States District Court of New Jersey, St. Martin v. West Windsor Police Department and Ptl. A. Robles et. al
- Expert Police Policies and Procedures, Retained 2021, Supreme Court of New York, O'Connell v. Patricia B. Vasta and Quality Bus Service
- Expert Use of Force, Aggravated Assault, Retained 2021, Superior Court of New Jersey, State v. Dalessio (Criminal Case)
- Expert Excessive Use of Force, Retained 2021, United States District Court Southern District of New York, Mendelson v. Officers Evans, Walz and Town of Pound Ridge New York
- Expert Excessive Use of Force, False Arrest, Unlawful Search & Seizure, Supervisory Liability, Retained 2021, United States District Court of Western Pennsylvania, Blair v. Roberts, Kezmarsky, and Hamilton
- Expert Wrongful Arrest, Wrongful Incarceration and Abuse of Process, Retained, 2021, Superior Court of New Jersey, Carlton Cartwright v. City of Passaic et.al.
- Expert Excessive Use of Force, Vehicle Pursuit, Police Practices, Procedures, and Policies Retained, 2020, United States District Court MD PA, Metcalf v. Commonwealth of Pennsylvania
- Expert Excessive Use of Force, Retained, 2020, Township of South Orange and South Orange SOA Local 12A Sgt. Michael Cucciniello

27

- Expert Excessive Use of Force, Retained, 2020, Administrative Law Judge of New Jersey Law Division, Diaz v. Clayton Police Department
- Expert Self-Defense- Retained, 2020, United States District Court of Minnesota, Garza v. State of Minnesota (Criminal Case)
- Expert Excessive Use of Force, Retained, 2020, United States District Court of New Jersey, Rossi v. City of Trenton
- Expert Excessive Use of Force and False Arrest, Retained, 2020, United States District Court of New Jersey, Fillichio v. State
- Expert Excessive Use of Force, Failure to Train, Retained, 2020, General Court of Justice Superior Court Division of North Carolina, Oleysa Tabaka v. City of Charlotte and Officer Brian E. Walsh et. al.
- Expert Firearm Safety and Care - Retained, 2019, U.S. District Court Southern Ohio, Eastern Division, Brady v. Jenkins et.al
- Expert Consultant -Aggravated Assault with a Firearm, – Retained, 2019, United States Air Force, United States v. Kilcrease
- Expert Excessive Use of Force – Retained, 2019, Superior Court of New Jersey, State v. Flinn (Criminal Case)
- Expert Excessive Use of Force – Retained, 2019, Superior Court of New Jersey, State v. Lindholm (Criminal Case)
- Expert Excessive Use of Force, Failure to Train and Supervise - Retained, 2019, U.S. District Court of New Jersey, Benyola v. City of Perth Amboy,
- Expert Self-Defense - Retained, 2019, Fairfax County, Virginia, McCrimmon v. Commonwealth of Virginia (Criminal Case)
- Expert Police Policies, Practices, Procedures, and Training- Retained, 2019, Red Bank Municipal Court, State v. Arcos (Criminal Case)
- Expert Excessive Use of Force- Retained, 2019, U.S. District Court for the Western District of Pennsylvania, Atkinson v. McCarthy et. al
- Expert Illegal Search and Seizure, False Arrest, and Unduly Suggestive Identification- Retained, 2019, U.S. District Court of the Commonwealth of Pennsylvania, Kenneth Grimes v. City of Philadelphia et al
- Expert Excessive Use of Force - Retained, 2018, U.S. District Court Eastern District of New York, Stratakos v. Nassau County Police Department
- Expert Police Practices and Procedures, Failure to Supervise, and Wrongful Death - Retained, 2018, Superior Court of New Jersey, Mosley v. City of Atlantic City, et al.
- Expert Vehicle Police Practices, Policies and Procedures, - Retained, 2018, Circuit Court of Mississippi, Traxler v. Mississippi Department of Public Safety, et. al.
- Expert Excessive Use of Force, Failure to Intervene and False Reports – Retained, 2018, Administrative Law Judge of New Jersey, State v. Kaelin.
- Expert Excessive Use of Force, Official Misconduct, Vehicle Pursuit Policies, Practices and Procedures, and False Reports- Retained, 2018, Superior Court of New Jersey (Criminal Case, State v. Reiman (Criminal Case)
- Expert Excessive Use of Force – Retained, 2017, Failure to Train and Supervise Properly, Superior Court of the District of Columbia Civil Division, Kearse v. District of Columbia & DC Police Officer Stanley Barker, Civil Action No. 2015, CA 006074B
- Expert Excessive Use of Force- Retained, Administrative Law Judge of New Jersey, State v. Isner
- Expert Excessive Use of Force – Retained, 2017, U.S. District Court of New Jersey, Failure to Train and Supervise Properly, Gonzalez v. Passaic County Sheriff's Officer Pickett, et al.

- Expert Excessive Use of Force, False Arrest, False Imprisonment, Unlawful Search & Seizure – Retained, 2017, U.S. District Court of New Jersey, Cato v. State
- Expert Consultant – Use of Force, Internal Affairs, Care, Handling and Transportation of Prisoners, and First Responders, Retained, 2017, U.S. District Court of New Jersey, Hernandez v. State et. al.
- Expert Excessive Use of Force – Retained, 2017, U.S. District Court of New Jersey, Kearney v. Chatham Borough et. al.
- Expert Police Practices and Procedures – Retained, 2017, U.S. District Court of New Jersey, Theil v. Medici, et.al
- Expert Police Training and Weapons – Retained, 2017, Superior Court of New Jersey Middlesex County, Dotro v. State, (Criminal Case)
- Expert Excessive Use of Force and Pursuit Driving, Policies, and Procedures- Retained, 2017, U.S. District Court of New Jersey, Gardner v. State. et.al.
- Expert Excessive Use of Force, Aggravated Assault, False Reports, and Official Misconduct – Retained, 2017, Superior Court of New Jersey, State v. Profitt (Criminal Case)
- Expert Excessive Use of Force – Retained, 2017, Garvey v. Commonwealth of Massachusetts. - Superior Court Suffolk County, SS (Criminal Case)
- Expert Excessive Use of Force – Retained, 2016, Mack Jr. v. Commonwealth of Pennsylvania – Superior Court of Montgomery County, (Criminal Case)
- Expert Excessive Use of Force- Retained, 2016, Cooney III v. Alberto et. al
- Expert Consultant- Search & Seizure, Internal Affairs/Police Administration – Retained, 2016 U.S. District Court of New Jersey, Lopez v. City of Plainfield, et al
- Expert Use of Force- Retained 2016, Gutierrez v. Woodbridge Township et. al
- Expert Use of Force- Retained 2015, Superior Court of Cape May, State v. Schweizer (Criminal Case)
- Expert Use of Force- Retained, 2015, Jones v. City of Vineland et. al
- Expert Use of Force- Retained, 2015, Peterson v. State. et al.
- Expert Use of Force- Settlement Hearing (Demonstration), 2015, U.S. District Court of New Jersey - Camden, Coney v. Caesars Entertainment Corporation et. al
- Expert Use of Force- Retained, 2014, Coney v. Caesars Entertainment Corporation, et al.
- Expert Care / Storage of Firearm - Retained, 2014, Estate of George v. County of Hudson, et al.
- Expert Use of Force and Expert Report, 2014, Baez v. City of Rahway, et al.
- Expert Use of Force - Retained, 2013, Panarello v. City of Vineland, et al.

**QUALIFIED EXPERT**

- Superior Court of New Jersey, Excessive Use of Force, Police Policies, Practices and Procedures, 2021, Diaz v. Borough of Clayton
- U.S. District Court Eastern District of New York, Excessive Use of Force, 2021, Stratakos v. Nassau County Police Department
- Hearing Officer – Township of South Orange Village, Excessive Use of Force, 2020, Township of South Orange Village South Orange SOA Local 12A, Sgt. Michael Cucciniello
- New Jersey Superior Court Camden Co., Indictment No.1850-08-18, Excessive Use of Force, 2019, State v. Flinn
- New Jersey Superior Court Middlesex Co., Docket No.17-10-01270, Excessive Use of Force, 2019, State v. Reiman
- Red Bank Municipal Court, Red Bank, New Jersey, Police Policies, Practices, Procedures, and Training, 2019, State v. Arcos

- Circuit Court of Scott County, Mississippi, No. 16-CV-136-SC-C, Vehicle Pursuit, Policies, Practices, and Procedures, 2018, <u>Traxler v. Mississippi Department of Public Safety</u>
- U.S. District Court, Trenton, New Jersey, CA No. 11-2594, Excessive Use of Force, 2017 <u>Peterson v. State et. al</u>
- Commonwealth of Massachusetts SUCR 2015-11287 – Excessive Use of Force, 2017 <u>Garvey v. Commonwealth of Massachusetts</u>
- New Jersey Superior Court Cape May Co., Docket No.15000199-001, Excessive Use of Force, 2016, <u>State v. Schweizer</u>

## AWARDS AND RECOGNIATION

- New Jersey State Parole Board- Recognize dedication and commitment to training and service of the New Jersey State Parole Board, 2010
- New Jersey State Police- Certification of Commendation for Outstanding Performance in a Dangerous Situation, 1991
- Atlantic County Association of Chiefs of Police- Certificate of Distinguished Service in recognition of personal courage and bravery, 1991

## PUBLICATIONS AND SPEAKING ENGAGEMENTS

- State Troopers Fraternal Association- Critical Incidents and Use of Force, October 2022
- Liberty University – LE Ethics and Use of Force (Criminal Justice Class), October 2021
- State Troopers Fraternal Association- Critical Incidents and Use of Force, October 2021
- Police One – De-Escalation Communication, August 2021
- The TASA Group Article: Use of Force and Law Enforcement, 2017
- <u>Krav Maga Professional Tactics: Appendix Use of Force and Law Enforcement,</u> YMAA Publication Center, Inc. 2016(Best Book Award Winner 2016)

## TRAINING AND CERTIFICATIONS

- Police Krav Maga specialized training and SWAT or special operators, avoiding the use of lethal force, tactics focused on saving lives, and only employ lethal force as a last resort. Non-lethal tools for SWAT operators to employ including when dealing with an emotionally disturbed person (EDP) attempts to disarm or attack the officer. Covering situations including edged weapon attack in close quarters Use of Force Reform, de-confliction and peaceful solutions options, de-escalation communication, and objective reasonable force. etc., June 2022- U.S. Training Center, Hamilton, N.J., David Kahn, Chief Instructor United States.
- Israeli Krav Maga LE II Instructor Update and Police Reform Course, Control holds, weapon retention, teamwork controls, vehicle extractions, 360 defenses, take down defenses, distraction techniques, front and rear defenses, distance, and verbal control, use of force, choke defense, ground defenses, handcuffing, restrain and control, vehicle extraction techniques, essentials of report writing, de-escalation, failure to intervene, tactical communication etc., May 2021- U.S. Training Center, Hamilton, N.J., David Kahn, Chief Instructor United States.
- Israeli Krav Maga LE II Instructor Update, Control holds, weapon retention, teamwork controls, vehicle extractions, 360 defenses, take down defenses, distraction techniques, front and rear defenses, distance and verbal control, use of force, choke defense, ground defenses, handcuffing, restrain and control, September 2020- U.S. Training Center, Hamilton, N.J., David Kahn, Chief Instructor United States.
- Israeli Krav Maga LE II Instructor Update, Control holds, weapon retention, teamwork controls, vehicle extractions, 360 defense, take down defenses, distraction techniques, front and rear defenses, distance and verbal control, use of force, choke defense, ground defenses, handcuffing,

restrain and control, April 2019- U.S. Training Center, Hamilton, N.J., David Kahn, Chief Instructor United States.

- Israeli Krav Maga LE II Instructor certification, September 2018- U.S. Training Center, Hamilton, N.J., David Kahn, Chief Instructor United States.
- Israeli Krav Maga DT - Instructor and LE Instructor re-certification, Handcuffing, non-compliant subjects, defensive tactics, combatives, restraint and control, use of force, vehicle extraction, etc., August 2018 – U.S. Training Center, Hamilton, N.J., David Kahn, Chief Instructor United States
- Israeli Krav Maga DT - Handcuffing non-compliant subjects and use of force, March 2017 – U.S. Training Center, Hamilton, N.J., David Kahn, Chief Instructor United States
- Israeli Krav Maga LE re-certification Instructor Course, December 2016, United States Training Center, Hamilton, N.J., David Kahn, Chief Instructor United States.
- Israeli Krav Maga LE Instructor Training-, Instructed DT tactics and use of force to local and state agencies, United States Training Center, Hamilton, N.J., David Kahn, Chief Instructor United States, December 2016.
- Israeli Krav Maga re-certification Instructor Course, June 2015, United States Training Center, Hamilton, N.J., David Kahn, Chief Instructor United States.
- Certified New Jersey State Police Law Enforcement Instructor - Firearms, self-defense, handcuffing, physical fitness, and basic police practices and procedure
- Certified New Jersey State Police Defensive Tactics Instructor Trainer (lead) - Israeli Krav Maga, Jiu-Jitsu, boxing, baton, weapon retention, and control holds.
- New Jersey State Police Use of Force Instructor - Attorney General Guidelines, Standard Operating Procedure B22 Use of Force policy, case law.
- Certified Instructor Trainer in Monadnock Programs – Defensive Tactics System (MDTS), Expandable Baton (MEB), and PR-24.
- Certified Instructor Oleoresin Capsicum (O.C. Spray)
- Armorer- Monadnock Expandable Baton (MEB)
- Taser Use of Force Risk Management and Legal Strategies Seminar, 2012
- Karbon Arms Taser Seminar, 2012
- Emergency Medical Technician (EMT)
- Certified Instructor New Jersey Police Training Commission – Defensive Tactics, Physical Fitness, and Use of Force
- Certified Israeli Krav Maga Law Enforcement Instructor - Federal, State, and Municipal police agencies
- Certified Israeli Krav Maga Staff Instructor - U.S. Training Center, Hamilton, N.J., David Kahn, Chief Instructor United States
- Israeli Krav Maga Advanced Training - Grandmaster Haim Gidon and Yigal Ardiv
- Israeli Combat and Counter Terrorism Training - Transition of firearm, hand and long gun to close quarter combatives.  Nir Mamen former IDF Instructor
- Israeli Counter Terrorism Training Seminar - Nir Mamen
- Additional defensive tactics training - Karate, Hapkido, Jiu-Jitsu, Israeli Krav Maga, edged weapons, blunt object impact weapons, ground fighting, boxing, control holds, take down techniques, weapon retention, handcuffing, verbal judo, and self-defense awareness
- Additional firearms training- Flying while armed (FAA), shotgun, long-gun (AR-15), and handgun (9mm)
- Baker Batshield Ballistic Shield Training
- State of New Jersey Defensive Tactics Training Committee - Focus group consisted of representatives of the Attorney General's Office, Department of Criminal Justice, Department of Parole, municipal agencies, and state police.

31

**AGENCIES TRAINED**

- New Jersey State Police
- Pennsylvania State Police
- Vermont Game and Wildlife Department – Law Enforcement Division
- Wall Township Police Department
- Robbinsville Police Department
- Plainsboro Police Department
- Princeton Police Department
- Princeton University Police
- University of Pennsylvania Police Department
- Hudson County Prosecutors Office
- West Wildwood Police Department
- Ocean City Police Department
- Wildwood Police Department
- Mercer County Sheriff Department
- Meadowlands Security Personnel
- Delran Police Department
- Ewing Police Department
- Wayne Police Department
- Hightstown Police Department
- Maple Shade Police Department
- Verona Police Department
- Bernard Township Police Department
- Mount Laurel Police Department
- Burlington Police Department
- Stone Harbor Police Department
- New Jersey Transit Police
- Port Authority Police Department
- Stafford Police Department
- Hamilton Township Police Department
- Hoboken Police Department
- Allendale Police Department
- Cinnaminson Police Department
- Egg Harbor City Police Department
- Atlantic City Police Department
- Bordentown Township Police Department
- Trenton Police Department
- Neptune Police Department
- Kenilworth Police Department
- Borough of Palisades Park Police Department
- New Jersey Department of Parole
- New Jersey Division of Gaming Enforcement (DGE)
- New Jersey Attorney General's Office
- New Jersey Department of Criminal Justice
- New Jersey Consumer Affairs Department
- Philadelphia Police Department
- Philadelphia Police Department Academy Instructors

32

- Mercer County Police Academy Instructors
- West Windsor Police Department
- Newport News Police Department
- Pennsylvania Wildlife Police Department
- Borough of Berwick Police Department
- New Jersey Transit Police Department
- New Jersey Transit Police Instructors
- United States Secret Service
- United States Secret Service Academy Instructors
- United States Marshals Service Fugitive Task Force
- United States Department of Housing & Urban Development Office of Inspector General
- St. John's Parish Sheriff's Office – Louisiana
- Cranford Police Department
- Irvington Police Department

# Exhibit "B"

## **MATERIALS REVIEWED**

Pursuant to your request, I have received the following materials related to the above-tilted matter.

1. Deposition of Karimu Hamilton dated November 7, 2022.
2. Radnor Township Police Department Incident #190008925 – Person Making Statement: Karimu Hamilton
3. Event Chronology – P1900223128
4. Use of Force Report- Officer Lacey Incident #190008899
5. Use of Force Model – The Use of Force Paradigm for Enforcement and Corrections
6. Baker v. Monroe Township 50 F.3rd 1186 (3rd Cir. 1995)
7. Graham v. Connor, 1989, 490 U.S. 386
8. Deposition of Radnor Township Police Officer Lacey – December 14, 2022
9. U.S. v. Givan, 320F. 3rd 452, 458 3rd (Cir 2003)

10. Illinois v. Caballes 543 U.S. 405 (2005)

I reserve the right to amend my opinions as expressed in this report when or if further facts, materials, reports, and/or any other evidence are submitted or presented for my review.