**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KARIMU HAMILTON,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | **No. 19-cv-2599** |
| | : | |
| **RADNOR TOWNSHIP, <u>ET</u> <u>AL.</u>,** | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

<u>**MEMORANDUM OPINION**</u>

**Goldberg, J.**                                                    **February 29, 2024**

Plaintiff Karimu Hamilton ("Plaintiff") has brought constitutional claims against her former neighbors, several police officers and municipal employees, and her local fire department related to searches of her home, which was ultimately designated as uninhabitable by the municipality. Unfortunately, what began as a dispute between two neighbors over a grapevine has transformed into a drawn-out, contentious, and unnecessary drain on court resources and, undoubtedly, the parties.

Plaintiffs' remaining claims are for alleged violations of her right to procedural due process, equal protection of the laws, and protection from unreasonable searches and seizures. All Defendants have moved for summary judgment on all claims. For the following reasons, Defendants' motions for summary judgment will be granted in their entirety.

**I.    STATEMENT OF FACTS**

The following facts are derived from the evidence submitted by the parties. Where there is conflicting evidence about a particular fact, Federal Rule of Civil Procedure 56 requires that I view such evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in that party's favor. <u>Hugh v. Butler County. Fam. YMCA</u>, 418 F.3d 265, 267 (3d Cir. 2005). The facts below are therefore presented in the light most favorable to Plaintiff.[1]

One additional point of clarification is needed. There are numerous instances in Plaintiff's briefing where she makes unsupported assertions that are not cited to the factual record. <u>See</u> Fed. R. Civ. P. 56(e)(2); <u>Seiple v. Cracker Barrel Old Country Store, Inc.</u>, No. 19-cv-2946, 2021 WL 5163198, at *1 n.1 (E.D. Pa. Nov. 5, 2021); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986) (party with burden of proof at summary judgment may not "rest on … allegations" but must come forward with "evidence"). Moreover, many of these uncited factual assertions are directly contradicted by the factual record. Further complicating matters, Plaintiff's briefing is rife with incomplete sentences and incorrect citations to both case law and the factual record, which make it unreasonably difficult to discern both what she is arguing and whether her claims are at all supported by the record.

Consequently, all unsupported facts pertaining to issues on which Plaintiffs bear the burden of proof, and which Defendants do not admit, are not properly before me and will not be considered.

---

[1]      References to the parties' pleadings will be made as follows: Ridgeway Defendant's Statement of Facts ("Ridgeway SOF"), Plaintiff's Response thereto and Counterstatement of Facts ("Pl. Resp. to Ridgeway SOF"), Ridgeway Defendant's Motion for Summary Judgment ("Ridgeway MSJ"), Plaintiff's Response thereto ("Pl. Resp. to Ridgeway MSJ"); Bryn Mawr Defendant's Statement of Facts ("Bryn Mawr SOF"), Plaintiff's Response thereto and Counterstatement of Facts ("Pl. Resp. to Bryn Mawr SOF"); Bryn Mawr Defendant's Motion for Summary Judgment ("Bryn Mawr MSJ"), Plaintiff's Response thereto ("Pl Resp. to Bryn Mawr MSJ"); Radnor Defendants' Statement of Facts ("Radnor SOF"), Plaintiff's Response thereto and Counterstatement of Facts ("Pl. Resp. to Radnor SOF"); Radnor Defendants' Motion for Summary Judgment ("Radnor MSJ"), Plaintiff's Response thereto ("Pl Resp. to Radnor MSJ").

To the extent a statement is undisputed by the parties, I will cite only to the parties' submissions.  If a statement is disputed and the dispute can be easily resolved by reference to the exhibits, I will cite the supporting exhibits.  If a statement is disputed, but the dispute cannot be resolved by reference to the exhibits, I will note the dispute.

A. **The Parties**

Plaintiff asserts claims against three distinct groups of Defendants: (1) Plaintiff's next-door neighbors, Justin and Rachel Ridgeway (the "Ridgeway Defendants"); (2) the Bryn Mawr Fire Company ("Bryn Mawr Defendants"); and (3) the "Radnor Defendants," which collectively refers to Radnor Township Police Superintendent Christopher B. Flanagan ("Flanagan"), and Radnor Township Police Officer Shawn Patterson ("Patterson"), Officer Stephanie Racht ("Racht"), Officer Patrick Lacey ("Lacey"), Sergeant Christopher Gluck ("Gluck"), Officer Brett Geaves ("Geaves"), and employees of the Department of Community Development Andrew Pancoast ("Pancoast") and Kevin Kochanski ("Kochanski").

B. **Events Giving Rise to Plaintiff's Claims**

   i. **Background**

Plaintiff, owner of 30 Garrett Avenue in Bryn Mawr, Pennsylvania, and the Ridgeway Defendants, owners of 32 Garrett Avenue, are adjoined neighbors in a twin house (e.g., there is a shared wall between the two properties). The Ridgeways purchased 32 Garrett Avenue in 2016 and began having issues with Plaintiff soon thereafter. Plaintiff called 911 in August 2018 claiming the Ridgeway Defendants "chopped down her grapevine" and "left dog poop" in the shared backyard. (Pl. Dep. 11:12-12:16.) Radnor Defendant Patterson responded to the call , told Plaintiff that this was a civil issue, and took no action. (Id. at 13:3-10.)

   ii. **December 3, 2018**

On December 3, 2018, the Ridgeway Defendants called 911 and reported that they smelled gas emanating from Plaintiff's home. Rachel Ridgeway testified that the odor smelled like "raw sewage or sewer gas" and that it was a "very, very foul smell." (R. Ridgeway Dep. 22:23-23:6.) Both the Bryn Mawr Defendants and the Radnor Defendants responded to the scene. The Bryn Mawr Defendants entered the Ridgeway Defendant's home, checked for gas, and detected none.

The Bryn Mawr Defendants then knocked on Plaintiff's door and explained that they were there because there may be a gas leak in her home. (Pl. Dep. 21:16-24.) Plaintiff let the two responding Bryn Mawr Defendants into her home because she "knew them" as her neighbor's children. (Id. at 23:1-18.) According to Plaintiff, one of the Radnor Defendants, later determined to be Officer Patterson, followed the Bryn Mawr Defendants into Plaintiff's home and "just kind of pushed past [her]. He "didn't touch [her] or anything," but he entered her home on the tails of the Bryn Mawr Defendants. (Id. at 23:4-18.)

The Bryn Mawr Defendants and Radnor Defendant Patterson were in Plaintiff's home for about six minutes. (Pl. Dep. 24:23-25:1.) The Bryn Mawr Defendants tested for gas and detected that there was cyanide gas in the home. The Radnor Defendants' report stated that the Bryn Mawr Defendants "report[ed] having reading of 0.5-1.5 cyanide gas and the place was vented and those levels dropped to trace amounts." (Bryn Mawr SOF ¶ 21; Pl. Resp. to Bryn Mawr SOF ¶ 21.) Plaintiff told the Radnor Defendants that she "had been without water for 2 weeks and the gas probably seeped in from the pipes."[2] (Bryn Mawr SOF ¶ 21; Pl. Resp.to Bryn Mawr SOF ¶ 21.) Plaintiff stated that the Bryn Mawr Defendants told her to open her windows and that she "should be okay." (Pl. Dep. 25:6-10.) Plaintiff denies that there was cyanide gas in her home and claims proper procedure was not followed because the Bryn Mawr Defendant's records do not state who

---

[2]     In Plaintiff's response to the Bryn Mawr Defendant's statement of facts, she admits to Bryn Mawr's recitation of the Radnor Defendants' report from the December 3, 2018 visit to her home. (Pl. Resp. to Bryn Mawr SOF ¶ 21; Bryn Mawr SOF ¶ 21.) However, in her deposition, Plaintiff stated that she "always had running water." (Pl. Dep. 41:7-24.) Records from Aqua, the water provider for the municipality, show that the water was off in Plaintiff's home from late November until December 3 or 4. Plaintiff disputes the accuracy of these records.

took the gas reading and Bryn Mawr has no record of a positive reading for cyanide gas.[3] (Pl. Resp. to Radnor SOF ¶ 43; Pl. Resp. to Radnor SOF ¶ 40.)

### iii.    December 4, 2018

On December 4, 2018, Plaintiff was contacted by Melissa Ward ("Ward") of Delaware County Children and Youth Services ("CYS"), who indicated that a mandatory reporter claimed that cyanide gas was detected in Plaintiff's home, and that CYS had to come check the premises to be sure it was safe for Plaintiff's then six-year-old daughter. (Pl. Dep. 27:7-16.) Plaintiff made arrangements to have Ward perform the check in the evening after Plaintiff was home from work. (Id. at 27:21-28:8.) Ward told Plaintiff that she would be arriving with a Radnor Township official to conduct the visit. (Id. at 27:15.)

Sometime that evening, a CYS caseworker arrived with approximately six police officers, which Plaintiff thought "was unacceptable for a home visit" and thus she initially did not allow anyone in her home.[4] (Pl. Dep. at 28:14-29:7.) The CYS caseworker and the six police officers stood on Plaintiff's porch while Plaintiff talked to Radnor Defendant Flanagan. (Id. at 34:7-21.) The CYS caseworker explained to Plaintiff that it was CYS policy to have a police officer escort her during a nighttime home visit. (Id. at 35:14-16.) Plaintiff asked "all the officers . . . and extra people to leave" but she allowed the CYS caseworker to enter her home with a female police officer, Radnor Defendant Racht. (Id. at 35:17-36:6.) Plaintiff stated in her deposition that she "did

---

[3]     In his deposition, Bryn Mawr Fire Chief Bryan Kincade testified that Bryn Mawr records show "no readings" as to cyanide gas on December 3, 2018. (Kincade Dep. 7:16-21.) It is unclear whether there was no record from the call at all, or whether an existing record shows there was no reading for cyanide gas.

[4]     It is unclear if the CYS caseworker who came to Plaintiff's home on December 4, 2018 was Ward or someone else. CYS and its employees are not party to this litigation, so the identity of the caseworker is not relevant for the purposes of this Opinion.

not want [Racht] to enter her home because [Plaintiff] did not believe that this was a police matter," but she let both the CYS caseworker and Racht into her home. (<u>Id</u>. at 36:5-11.)

After the CYS caseworker and Racht did a 10-minute walk through of Plaintiff's home, the caseworker made several calls and ultimately determined that Plaintiff's home was suitable for the child. (<u>See</u> Radnor Ex.17-18.)

### iv.   June 8, 2019

On June 8, 2019, the Ridgeway Defendants called 911 and reported that they smelled gas and smoke emanating from Plaintiff's home. Upon arrival, the Bryn Mawr Defendants noticed a "strong odor of sewer gas." (Bryn Mawr SOF ¶ 12; Pl. Resp. to Bryn Mawr SOF ¶ 12.) Plaintiff did not allow the Bryn Mawr Defendants or the Radnor Defendants to enter her home. (Radnor SOF ¶ 20; Pl Resp. to Radnor SOF ¶ 20.) Plaintiff called PECO, a gas utility provider, and allowed a PECO representative to enter her home to test for gas. A PECO representative arrived and found no evidence of a gas leak, but noted in their report that there was a "strong sewage odor" in the home. (Radnor Ex. 5.) A PECO representative contacted the Radnor Defendants to let them know there was sewage in Plaintiff's basement. (Radnor SOF ¶ 20; Pl Resp. to Radnor SOF ¶ 20.)

### v.   June 11, 2019

On June 11, 2019, Justin Ridgeway called 911 and stated his "neighbor [was] outside, using loud profanity, cursing at [him]," and that "she ha[d] some sort of saw blade in her hand." (911 Transcript at 2:6-8.) The 911 Dispatcher asked if the neighbor had a knife in her hand, to which Justin Ridgeway responded "it looks more like a saw to cut branches." (<u>Id</u>. at 2:14-15.) Ridgeway told the dispatcher that Plaintiff was not threatening him and that she was walking up the street with the saw in her hand. (<u>Id</u>. at 2:20-25.) An alert call went out to officers stating that there was a suspect with a knife threatening neighbors. (Radnor SOF ¶ 58.)

According to Plaintiff, she had borrowed hedge trimmers from a neighbor and was using them to do yard work. (Pl. Dep. 46:4-24.) When she was finished, she began walking down the street to return them, holding the hedge trimmers and wheeling a garden cart with plants behind her. (Id. at 46:4-47:23.) She claims she was "greeted by an undercover cop" who pointed a gun at her and told her to "freeze." (Id. at 48:2-4.) The police officer, later identified to be Radnor Defendant Lacey, ordered her to drop the hedge clippers, and held her at gun point for six minutes while he called for backup (Id. at 48:9-49:19.) Lacey instructed Plaintiff to sit on the ground, but because she was wearing a dress, she felt she could not do so and she continued to stand. (Id. at 50:16-22.) By the time the other officers, later identified as Radnor Defendants Gluck and Geaves, arrived, Lacey had put his gun away. (Id. 50:11-13.) Lacey explained to Plaintiff that someone had called 911 alleging she was trying to "attack them with a knife." (Id. at 48:11-12.) Plaintiff was never placed in handcuffs. (Id. at 51:8-10.)

Lacey and Geaves left the scene, but Gluck told her she needed to wait because Flanagan wanted to talk to her. (Id. at 51:15-19.) Flanagan arrived ten minutes later and asked Plaintiff to let police in her home, and stated that if she did not, the Radnor Defendants would seek an administrative warrant.[5] (Pl. Resp. to Radnor SOF ¶¶ 28-30.) Plaintiff refused Flanagan entry, and he left. The entire encounter with the Radnor Defendants lasted approximately 25 minutes.[6] (Id. at ¶ 67.)

---

[5]    Plaintiff claims she did not understand why the Radnor Defendants wanted to inspect her home because, at that time, she alleges that everything was "working and looking good" with her property. (Pl. Dep. 53:10-15.)

[6]    The Radnor Defendants' account of this incident is different. Lacey claims he never pointed his gun at Plaintiff and that he only unholstered his gun and held it in the low-ready position after Plaintiff refused to drop the hedge trimmers. Once Plaintiff dropped the hedge trimmers, he re-holstered his gun. Lacey had his gun in the low-ready position for about five to six seconds. (Radnor SOF ¶¶ 55-59.)

vi.     **Designation of 30 Garrett Avenue as "Uninhabitable"**

Plaintiff testified in her deposition that prior to December 3, 2018, the Radnor Defendants had been "in touch" with her "quite often" about "issues that arose on [her] property that may or may not have been violating code." (Pl. Dep. at 17:14-24.) Following the December 3, 2018 incident, the Radnor Defendants mailed a notice dated December 14, 2018 to the Ridgeway Defendants and Plaintiff requiring that their plumbing system be inspected by a plumber to ensure it was in working order. (Radnor Ex. 17.) That notice cited to the 2009 International Property Maintenance Code and cautioned that if the proper information or repairs were not provided in time, "the Township will seek additional enforcement actions afforded by the Municipal Regulations." (Id.) The Ridgeways complied and produced a certification to the Radnor Defendants. Plaintiff admits that the Radnor Defendants sent this notice, but states that she "did not have the funds for the work." (Radnor SOF ¶ 71; Pl. Resp. to Radnor SOF ¶ 71.)

On January 18, 2019, the Radnor Defendants issued a Notice of Violation to Plaintiff for failing to comply with the December 14, 2018 notice. (Radnor SOF ¶ 72; Pl. Resp to Radnor SOF ¶ 72; Radnor Ex. 18.) The Notice of Violation identified two plumbing issues, which Plaintiff had ten days to correct, and several violations related to the exterior of her home, which she had 90 days to correct. (Radnor. Ex. 18.) The notice stated that Plaintiff had a right to appeal, explained the appeal process, and warned that failure to timely appeal and/or make the necessary repairs would be punishable by fines and penalties, including attorney and court fees.

In April 2019, the Radnor Defendants contacted Aqua, the municipal water provider, to determine whether water service was on at Plaintiff's residence. Aqua could not provide any information related to Plaintiff's water service because she had restricted release of information on the account. (Radnor Ex. 24.) Later in April, the Radnor Defendants filed a Complaint in Equity and a Petition for a Preliminary Injunction "seeking to compel Hamilton to comply with the Radnor

Township Property Maintenance Code." (Radnor Ex. 24.) After four service attempts, the process server was able to make contact with Plaintiff on May 29, 2019. Plaintiff came to the door but refused to open the door and "requested the pleadings be placed in her mailbox." (Radnor Ex. 24.)

On June 11, 2019, while other Radnor Defendants were investigating the Ridgeway's 911 call, Flanagan arrived on the scene and requested access to Plaintiff's property, "as to preempt an administrative search warrant and minimize the impact on the juvenile living" there. Plaintiff denied access. (Radnor Ex. 24; Radnor SOF ¶ 85; P Resp. to SOF ¶ 85.)

Plaintiff wrote a letter dated June 13, 2019 "where she made it clear that she was aware of plumbing issues and that she needed to maintain her lawn." (Radnor SOF at ¶ 37, Pl. Resp. to Radnor SOF at ¶ 37.) That same day, Radnor Defendant Pancoast completed an application for an administrative search warrant. (Radnor Ex. 24.) The affidavit of probable cause was supported by testimony from Patterson, from the December 3, 2018 incident, and Pancoast, one of the Radnor Defendants who Plaintiff refused entry on December 4, 2018, the plumbing notice from December 14, and the Notice of Violation issued to Plaintiff on January 18, 2019. (Radnor SOF ¶¶ 74-75; Plaintiff Resp. to Radnor SOF ¶¶ 74-75.)

An administrative warrant was served on Plaintiff's residence on June 14, 2019. (Radnor SOF ¶ 32.) Plaintiff alleges twenty police officers arrived at her house. Plaintiff looked at the warrant and let them into her home. (Radnor SOF ¶ 33.) She claims that the Radnor Defendants wanted to take her and her daughter to a shelter, but she refused. (Pl. Dep. 58:5-59:15.)

Kochanski testified that during the search conducted pursuant to the administrative warrant, he "observed a malfunctioning sewer system, raw sewage in the basement, rat and mice feces, collapsed ceilings, non-functioning sinks and tubs, the sump pump with a hose discharging sewage out the basement window and general squalor conditions including an overflowing toilet in the basement." (Radnor SOF ¶ 95; Pl Resp. to Radnor SOF ¶ 95.) On June 17, 2019, Kochanski

9

signed a Notice of Violation stating that Plaintiff's home was unsafe for human habitation and listed thirty violations of the Property Code of Radnor Township. (Radnor Ex.21.) Plaintiff moved in with a family member. (Pl. Dep. 62:1-21.)

Radnor Township subsequently filed a complaint in the Delaware County Court of Common Pleas against Plaintiff seeking injunctive relief for various housing code violations that they determined existed at Plaintiff's property. (Third Am. Compl. ¶¶ 37–43); see also Radnor Township v. Hamilton, Docket No. CV-2019-003622 (Delaware Cnty. Ct. of Common Pleas).  On July 11, 2019, a state court judge entered an order requiring Plaintiff to correct code violations in her home and prohibiting Plaintiff from staying overnight on the property until such violations were corrected. Plaintiff complied with the order, corrected the code violations over a period of seven months, and moved back into her home in February 2020. (Pl. Dep. 62:1-5.)

### C. **Procedural History**

For the purposes of resolving the motions pending before me, I need not rehash the extensive procedural history of this case. The Third Amended Complaint is the operative complaint and states claims for: (1) violations of the Fourth Amendment against the Ridgeway Defendants, Bryn Mawr Defendants, and certain Radnor Defendants for illegal searches; (2) equal protection violations against certain Radnor Defendants for selective treatment; (3) eviction without due process, in violation of the Fourteenth Amendment, against certain Radnor Defendants; (4) false arrest against certain Radnor Defendants and the Ridgeway Defendants; and (5) use of excessive force against certain Radnor Defendants. After a long and contentious period of discovery, the Ridgeway, Bryn Mawr, and Radnor Defendants have all moved for summary judgment as to all claims against them.

## II.     STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is evidence from which a reasonable factfinder could return a verdict for the non-moving party, and a dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" that show a

genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III.   DISCUSSION

### A.   <u>Claims against the Ridgeway Defendants</u>

Plaintiff alleges that the Ridgeway Defendants were acting under the color of state law because they were part of a continuing conspiracy with the Radnor Defendants. Plaintiff claims a conspiracy existed between the Ridgeway Defendants and the Radnor Defendants in that: (1) the Ridgeway Defendants made multiple calls to the Radnor Defendants, during which the Ridgeway Defendants lied about smelling gas emanating from Plaintiff's house; (2) the Ridgeway Defendants lied about seeing Plaintiff with a knife in the street, which turned out to be a hand saw used for gardening; and (3) the Ridgeway Defendants' calls were made in the continuing conspiracy with police to force warrantless searches of Plaintiff's home which led to her eviction, and her warrantless arrest. (Pl. Resp. to Ridgeway MSJ at 2-4.)

The Ridgeway Defendants argue that both claims against them—for illegal searches in violation of the Fourth Amendment (Count One) and for false arrest (Count Five)—are only viable against state actors or entities acting under the color of state law, and that Plaintiff has not offered proof that they acted under color of state law.

A private citizen can seek redress under Section 1983 when a government actor violates that citizen's constitutional rights. "To allege a claim pursuant to 42 U.S.C. § 1983 for violations of the Constitution, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988). Whether a defendant is acting under the color of state law depends on whether there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the

State itself." <u>Leshko v. Servis</u>, 423 F.3d 337, 339 (3d Cir. 2005) (internal citation and quotations omitted). "In order to establish the requisite level of joint participation and collaboration, a plaintiff must aver the existence of a 'pre-arranged plan [between the police and a private entity] by which the police substituted the judgment of [a] private part[y] for their own official authority.'" <u>Boyer v. Mohring</u>, 994 F. Supp. 2d 649, 657 (E.D. Pa. 2014) (quoting <u>Cruz v. Donnelly</u>, 727 F.2d 79, 80 (3d Cir. 1984)).

A private citizen does not become a state actor by calling law enforcement to report a concern. <u>See</u> <u>Cooper v. Muldoon</u>, Civ. No. 05-4780, 2006 WL 1117870, at *2 (E.D. Pa. Apr. 26, 2006) ("Merely calling the police, furnishing information to the police, or communicating with a state official does not rise to the level of joint action necessary to transform a private entity into a state actor."). Even further, a private citizen does not become a state actor even when such report contains deliberately false information. <u>See</u> <u>Collins v. Christie</u>, Civ. No. 06-4702, 2007 WL 2407105, at n.9 (E.D. Pa. 2007) (citing <u>Kahermanes v. Marchese</u>, 361 F. Supp. 168, 171 (E.D. Pa. 1973) ("The deliberate giving of false information by an individual to a police officer to cause the arrest of another does not give rise to a cause of action under the Civil Rights Acts.")).

However, when a private citizen furnishes knowingly false information to the police in furtherance of a conspiracy to violate another's constitutional rights, a private actor can turn into a state actor. Critically, "[a] conspiracy is not parallel conduct by different parties; it must embody, at its heart, an agreement between the defendants and state officials—a meeting of the minds—to violate the plaintiff's rights." <u>Mikhail v. Kahn</u>, 991 F. Supp. 2d 596, 645 (E.D. Pa. 2014), <u>aff'd</u>, 572 F. App'x 68 (3d Cir. 2014) (internal citations and quotations omitted).

Here, it is undisputed the Ridgeway Defendants are not law enforcement agents. Accordingly, to succeed on her claims, Plaintiff must show that the Ridgeways were acting under the color of state law. Taking the facts in the light most favorable to Plaintiff as the nonmoving

party, the evidence proffered by Plaintiff in an attempt to establish the existence of a conspiracy

between the Ridgeway Defendants and the Radnor Defendants is as follows:

- From 2016 to February 2022, Justin Ridgeway called 911 four or five times regarding Plaintiff. (Pl. Resp. to SOF ¶ 4; J. Ridgeway Dep. 6:12-18.)

- The Ridgeway Defendants made "2 or 3 false claims of dangerous gasses or odors" related to Plaintiff's home. (Pl. Resp. to SOF ¶ 7.)

- Christopher Flanagan, Police Superintendent, spoke to Rachel Ridgeway on the phone at some point and may have given her his cell phone number. Flanagan never spoke to Justin Ridgeway on the phone. (Flanagan Dep. 28:17-29:14.)

- Flanagan was aware that the Ridgeways were keeping a log of activities related to complaints they made to the authorities about Plaintiff. He does not remember if he told the Ridgeways to keep a log, but that he "would suggest to anybody to keep a log in a situation like this. So if they asked me, I would say yes." (Flanagan Dep. 85:2-9.) Flanagan further testified that "[i]t is my normal protocol for repeat issues that anybody keep a written log of activities related to whatever it is the issue may be." (Id. at 85:17-19.)

This factual record cannot establish that the "police substituted the judgment of [a] private

part[y] for their own official authority," such to find that the Ridgeway Defendants were acting

under the color of state law. Cruz, 727 F.2d at 80. The fact the Ridgeways called 911 multiple

times for concerns over Plaintiff and/or Plaintiff's property does not turn them into state actors.

Even if the information the Ridgeway's furnished to 911was knowingly false, it would still be

insufficient to turn them into state actors because Plaintiff has not pointed to competent evidence

of a conspiracy between the Ridgeway and the Radnor Defendants. Plaintiff has offered no proof

that there was a meeting of the minds between the Radnor Defendants and the Ridgeway

Defendants to violate Plaintiff's rights. Even if Flanagan advised the Ridgeways to keep a log of

their calls to 911, Plaintiff fails to explain how this establishes the existence of a conspiracy.

Because Plaintiff cannot establish that the Ridgeways are state actors, I need not proceed

further in analyzing the constitutional claims against them. Summary judgment will be entered in

favor of the Ridgeway Defendants.

### B. <u>Claim against the Bryn Mawr Defendants</u>

Plaintiff claims that the Bryn Mawr Defendants violated her Fourth Amendment right against unreasonable searches by entering her home on December 3, 2018 and June 18, 2019. (Pl. Resp. to Bryn Mawr MSJ at 8.) In her brief, Plaintiff asserts that the Bryn Mawr Defendants "went in and looked around" and, therefore, conducted searches of her home. (<u>Id.</u>) The Bryn Mawr Defendants argue that summary judgment should be granted as to this count because the undisputed facts reflect that on one occasion, Plaintiff consented to their entry, and on the other, she denied their entry and they never entered her home.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by governmental actors.  U.S. Const. amend. IV. It is "well settled" that under the Fourth Amendment, a "search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973). "Consent is an exception to the requirements of both a warrant and probable cause," and it must be given voluntarily. <u>United States v. Stabile</u>, 633 F.3d 219, 231 (3d Cir. 2011) (citing cases).

Here, as to the December 3, 2018 encounter between Plaintiff and Bryn Mawr Defendants, Plaintiff stated in her deposition that she consented to the Bryn Mawr Defendants entering her home. She recalls knowing the two firefighters who responded to the 911 call because "they were [her] neighbor's children," and admitted that when they knocked on the door, "I let them in. I know them. I let them in." (Pl Dep. 22:6-23:14). Plaintiff makes no argument and points to no evidence that her consent to the Bryn Mawr Defendants entering her home was anything but voluntary.

As to the June 8, 2019 encounter, Plaintiff concedes that the Bryn Mawr Defendants never entered her home that day. (Pl. Resp. to Radnor SOF at ¶ 20; Pl. Resp. to Bryn Mawr SOF at ¶ 25.)

The Bryn Mawr Defendants arrived on the scene and knocked on Plaintiff's door. She came to the door, locked it, and "informed the officer that she would not grant entry" to either the Radnor Defendants or the Bryn Mawr Defendants. (Resp. to Bryn Mawr SOF at ¶ 10.) Therefore, Plaintiff cannot establish that the Bryn Mawr Defendants conducted a search at all, let alone a search in violation of the Fourth Amendment.  Because Plaintiff has failed to show a genuine issue of material fact as to this claim, I will grant summary judgment in favor of the Bryn Mawr Defendants.[7]

### C. Claims against the Radnor Township Defendants

#### i. Count One: Illegal Search under the Fourth Amendment (Patterson and Racht)

Plaintiff claims that Radnor Defendants Patterson and Racht violated her right against unreasonable searches by entering her home on December 3, 2018 and December 4, 2018, respectively. Plaintiff asserts that (1) she never consented to Patterson or Racht entering her home, and (2) there was no gas detected in her home, such that Radnor Defendants' entry was not justified by exigent circumstances. (Pl. Resp. to Radnor MSJ at 7-10.) The Radnor Defendants argue that Plaintiff consented to their entry, and even if she didn't, the exigency exception to the warrant requirement applies because they were responding to a 911 call about a gas leak.

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by governmental actors.  U.S. Const. amend. IV. It is "well settled" that under the Fourth Amendment, a "search conducted without a warrant issued upon probable cause is per se

---

[7]     The Bryn Mawr Defendants argue, in the alternative, that the exigent circumstances created by a 911 call about a gas leak would constitute an exception to the Fourth Amendment's warrant requirement. Because I find that there was consent as to the December search and there was no search in June, I need not determine if the exigency exception to Fourth Amendment warrant requirement applies.

unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (internal citations and quotations omitted). Two of those established exceptions are when a person consents to the search and when exigent circumstances exist.

"Consent is an exception to the requirements of both a warrant and probable cause," and that consent must be given voluntarily. United States v. Stabile, 633 F.3d 219, 231 (3d Cir. 2011) (citing cases). Voluntariness is determined "by examining the totality of the circumstances." United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009).

Exigent circumstances also create an exception to the Fourth Amendment's warrant requirement. Kubicki v. Whitemarsh Twp., 270 Fed. App'x 127, 128 (3d Cir. 2008) (citations omitted).  "Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." United States v. Coles, 437 F.3d 361, 366 (3d Cir. 2006). "[T]he state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat."  Good v. Dauphin Cty. Soc. Servs. for Children & Youth, 891 F.2d 1087, 1094 (3d Cir. 1989). The question is "whether the officer's determination was objectively reasonable at the time in question, based on the reasonably discoverable information available to the officer at the time." United States v. Sculco, 82 F. Supp. 2d 410, 417 (E.D. Pa. 2000).

### a. Patterson

As to Patterson, Plaintiff claims that he "just kind of pushed past [her]." He "didn't touch [her] or anything," but he entered her home, without her permission, on the tails of the Bryn Mawr Defendants. (Pl. Dep. 23:4-18.) The Radnor Defendants respond that Plaintiff consented to Patterson's entry because she "remain[ed] silent" when Patterson entered her home with the Bryn

Mawr Defendants. (Radnor MSJ at 9.) Accordingly, taking the facts in the light most favorable to Plaintiff as the nonmoving party, it appears that a factual issue exists as to whether Plaintiff consented to Patterson's entry.

Despite that factual issue, the Radnor Defendants' respond that it is undisputed that a call about a gas leak was received and that presented exigent circumstances because Patterson "ha[d] reason to believe that life or limb [was] in immediate jeopardy and that the intrusion [was] reasonably necessary to alleviate the threat." Good v. Dauphin Cty. Soc. Servs. for Children & Youth, 891 F.2d 1087, 1094 (3d Cir. 1989). To the extent Plaintiff argues that no cyanide gas was ultimately found in her home, it is immaterial because such searches are permissible under the community caretaking doctrine. This doctrine "is an exception to the warrant requirement of the Fourth Amendment and allows police with a non-law enforcement purpose to seize or search a person or property in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity." Vargas v. City of Philadelphia, 783 F.3d 962, 971 (3d Cir. 2015) (internal citations and quotations omitted).

The policy considerations behind the community caretaking doctrine are well founded. "The business of policemen and firemen is to act, not speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." United States v. Torres, 534 F.3d 207, 212 (3d Cir. 2008) (internal citations and quotations omitted). Police and fire departments need to be able to reasonably respond to and investigate potential threats, as they did here during the six-minute search of Plaintiff's home responding to a call about a potential gas leak. And while Plaintiff may dispute that a leak was ultimately found, it remains undisputed that the Defendants, including Patterson, entered the home based upon a report of a gas leak. Accordingly, the factual record

18

cannot establish that Radnor Defendant Patterson violated Plaintiff's rights under the Fourth Amendment as to his entry into her home on December 3, 2018.

Finally, even assuming a Fourth Amendment violation occurred, qualified immunity would apply. Government officials are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 614 (1999) (internal quotations and citation omitted). For a right to be "clearly established" in the context of qualified immunity, "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Wilson, 526 U.S. at 615 (citing Anderson v. Creighton, 483 U.S. 635, 639 (1987)). "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." Id. "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) (per curiam) (internal citation and quotations omitted). "[P]olice officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." Id. (internal citation and quotations omitted.) "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (internal citations and quotations omitted).

Thus, Patterson is immune from liability "unless existing precedent squarely governs the specific facts at issue." Kisela, 138 S. Ct. at 1153. Plaintiff has cited no authority, and I cannot find any, that holds that it is unreasonable to enter a premises under circumstances analogous to those presented here. Accordingly, any Fourth Amendment violation that may have occurred was therefore not of a "clearly established" right. Anderson, 483 U.S. at 639.

### b. Racht

As to Racht, it is undisputed that Plaintiff consented to Racht entering her home. Plaintiff stated in her deposition that she "did not want [Racht] to enter her home because [Plaintiff] did not believe that this was a police matter," but she ultimately let both the CYS caseworker and Racht in because she understood it was CYS policy to have an officer accompany CYS employees on night visits. (Id. at 36:5-11.) Plaintiff's consent to Racht's entry is made even clearer in light of the fact Plaintiff actively denied entry to all other officers present. Plaintiff instructed "all the officers . . . and extra people to leave" but specifically allowed Racht to enter her home. (Pl. Dep. 35:17-36:6.)

To the extent that Plaintiff's consent could be considered involuntary, qualified immunity would apply. Racht is immune from liability "unless existing precedent squarely governs the specific facts at issue." Kisela, 138 S. Ct. at 1153. Plaintiff has cited no authority, and I cannot find any, that holds that it is unreasonable to enter a premises under circumstances analogous to those presented here. Accordingly, any Fourth Amendment violation that may have occurred was therefore not of a "clearly established" right. Anderson, 483 U.S. at 639.

### ii.    Count Three: Selective Treatment under the Equal Protection Clause (Flanagan, Kochanski, Pancoast)

Plaintiff claims several of the Radnor Defendants treated her "differently than whites because normal procedures were disregarded" when dealing with her. (Pl. Resp. to Radnor MSJ at 10.) In response, the Radnor Defendants argue that there is no evidence in the record that could establish selective treatment as to Superintendent Flanagan, Director of Community Development Kochanski, and Community Development employee Pancoast.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

direction that all persons similarly situated should be treated alike." <u>City of Cleburne, Tex. v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985). To establish a claim of equal protection, Plaintiff must show that the actions taken by the government: "(1) had a discriminatory effect and (2) were motivated by a discriminatory purpose." <u>Bradley v. United States</u>, 299 F.3d 197, 205 (3d Cir. 2002). To prove discriminatory effect, a plaintiff must show that "she is a member of a protected class and that she was treated differently from similarly situated individuals in an unprotected class." <u>Id.</u> at 206.

It is undisputed that Plaintiff is an African-American woman who is in a protected class. Therefore, the only inquiry that remains is whether the factual record reflects that the Radnor Defendants treated her differently from similarly situated members not of the same class. Plaintiff claims that Radnor Defendants Flanagan, Kochanski, and Pancoast treated her differently than unnamed Caucasian residents in terms of how code violations were enforced. The Radnor Defendants assert that "in the past when other residences were deemed unfit for habitation, each time the residents were Caucasian, not African American." (Radnor SOF ¶ 87; Pl. Resp. to Radnor SOF ¶ 87.) Plaintiff admits this fact. (Pl. Resp. to Radnor SOF ¶¶ 87, 92.) Plaintiff has not identified any additional evidence to support her claim, and therefore has not pointed to "evidence that she was treated differently from similarly situated individuals in an unprotected class" by Flanagan, Kochanski, or Pancoast. <u>Bradley</u>, 299 F.3d at 205. Accordingly, summary judgment as to Radnor Defendants Flanagan, Kochanski, and Pancoast will be granted as to this claim.

### iii.    Count Four: Due Process Violation under the Fourteenth Amendment (Flanagan, Kochanski, Pancoast)

Plaintiff contends that her procedural due process rights were violated when the Radnor Defendants deemed her property unfit for human habitation without giving her sufficient notice. In support of her procedural due process claim, she argues that she was not given proper notice or

an opportunity for a hearing prior to her "eviction."[8] She contends that the various housing code violation letters and court notices were insufficient. (Pl. Resp. to Radnor MSJ at 24.)

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319, 332 (1976). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Id. at 333 (internal citations and quotations omitted). In determining the level of process that is required before a person is deprived of liberty or property, courts normally consider: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id. at 335.

It is undisputed that the Radnor Defendants deprived Plaintiff of her possessory interest in her property on June 17, 2019 when Kochanski issued the Notice of Violation stating Plaintiff's home was unfit for habitation.  The question is thus whether Plaintiff can establish that deprivation occurred without "due process of law"—that is, without affording Plaintiff an "opportunity to be heard at a meaningful time and in a meaningful manner" in light of the three considerations enumerated above.

---

[8]     The Radnor Defendants take issue with Plaintiff's use of the word eviction, but do not explain why. The Radnor Defendants use the word "condemnation" to describe the process by which Plaintiff's house was deemed unsuitable for human habitation. For the purposes of my analysis, I refer to action taken by the Radnor Defendants as its determination that Plaintiff's home was uninhabitable.

Plaintiff does not allege that the Radnor Defendants did not follow the condemnation process set forth by the municipality, nor does she allege that the processes the municipality has to effectuate condemnations are unconstitutional.  Instead, she seeks to hold Flanagan, Kochanski, and Pancoast liable as named employees for their specific roles in the condemnation process. "To impose liability on [an] individual defendant[]" under 42 U.S.C. § 1983, a plaintiff "must show that … [the defendant] individually participated in the alleged constitutional violation or approved of it." C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005). Plaintiff claims the following facts support that the three Radnor Defendants deprived her of due process under the law:

- Flanagan testified that he talked with Plaintiff on June 11, 2019 and attempted to facilitate a conversation with her to "come up with a solution for the situation that was going on at the property." (Radnor SOF ¶ 96, Pl. Resp. to Radnor SOF ¶ 96.)

- Pancoast signed the affidavit of probable cause that corresponded with the administrative warrant without independently investigating whether each underlying fact about her property was true.  (Radnor SOF ¶ 86; Pl. Resp. to Radnor SOF ¶ 86.)

- Kochanski sent Plaintiff a correspondence ordering that she have her sewer system inspected in December 2018. (Radnor SOF ¶ 93.) Plaintiff did not comply. Kochanski issued the Notice of Violation as to her plumbing system on January 18, 2019, which set forth her appeal rights. (Id. at ¶ 94.) This notice did not state that she could be evicted from her home by not complying. (Pl. Resp. to Radnor SOF at ¶ 94.) Kochanski signed the Notice of Violation dated June 17, 2019, deeming Plaintiff's home was unfit for habitation. (Radnor Ex. 21.)

In light of these facts, Plaintiff raises a variety of arguments as to why her right to procedural due process was violated as follows.

### a. Flanagan

As to Flanagan, Plaintiff claims he deprived her of her right to procedural due process because "he did not know if she received notice before serving the warrant." (Pl. Resp. to Radnor SOF, Counterstatement of Facts ¶¶ 72-73.) Plaintiff fails to cite to other facts or any law establishing that a procedural due process violation occurs when a police officer lacks knowledge

about what notice a plaintiff may or may not have had prior to serving a warrant. Accordingly, summary judgment will be entered in Radnor Defendant Flanagan's favor as to this claim.

### b. Pancoast

As to Pancoast, Plaintiff disputes the validity of the warrant and its corresponding affidavit of probable cause. Plaintiff denies "that the warrant was truthful" because she believes there was never cyanide gas in her home, and even if there was, the Bryn Mawr Defendants never told her such gas was harmful. (Pl. Resp. to Radnor SOF ¶ 74.) She also argues there was no sewage in her basement, and even if there was, "the property was not dangerous to live in or uninhabitable" according to CYS's report on December 4, 2018. (Id. at ¶ 82.) She provides no additional evidence in support of the proposition that the affidavit of probable cause was untruthful.

She further contends that Pancoast did not have personal knowledge of every fact in the affidavit and should have conducted an independent investigation as to the truth of each fact in the warrant. (Id. at ¶¶ 86, 87.) But Plaintiff cites to no case law supporting the proposition that Pancoast was required to engage in an independent investigation of the facts to prevent violating her right to procedural due process. The Radnor Defendants assert that Pancoast was aware of the reports and complaints made to the Radnor Defendants about Plaintiff's residence and had no reason to believe the information in the warrant application was inaccurate. (Radnor SOF ¶ 87; Pl. Resp. to Radnor SOF ¶ 87.) Pancoast further testified that he believed the information in the affidavit was correct "and that the totality of the information warranted a search of the property" because he felt there were "life and safety concerns at [Plaintiff's residence] and the adjoining residence." (Pancoast Dep. 27:24-28:21.) This undisputed factual record cannot establish that Pancoast "participated in the alleged constitutional violation or approved of it." Ridgewood Bd. of Educ., 430 F.3d at 173. Accordingly, summary judgment will be entered in Radnor Defendant Pancoast's favor as to this claim.

### c. Kochanski

Finally, as to Kochanski, Plaintiff alleges that "it is unknown if [she] was given deadlines prior to June 14, 2019 to fix issues with her home" and that "she received no notice" prior to June 14, 2019 that she could be evicted from her home. (Pl. Resp. to Radnor MSJ at 17, 24, 27.)

The facts of record reflect that Plaintiff was removed from her home after the Radnor Defendants served the administrative warrant on June 14, 2019. Specifically, the Notice of Violation dated June 17, 2019, which declared Plaintiff's home unfit for human habitation, was signed by Kochanski. (Radnor Ex. 21.) Pancoast testified that "typical procedure" is for the Radnor Defendants to send a formal notice of violation the day the Department of Community Development conducts a search "or soon thereafter." (Pancoast Dep. 56:18-57:6.)

When asked in deposition if the Radnor Defendants gave Plaintiff notice prior to June 2019 "that if she didn't take certain action by a certain date, that … she would not be able to live [in her home] anymore," Kochanski responded that "in the notice of violation [from December], there is language at the end of the notice that refers to the township's ability to take additional enforcement actions." (Kochanski Dep. 30:4-14.)

The December 14, 2018 Notice of Violation clearly states that if the plumbing work was not completed by December 31, 2018, "the Township will seek additional enforcement actions afforded by the Municipal Regulations." (Radnor Ex. 17.)  The record also reflects that the December 14, 2018 Notice of Violation was received by the Ridgeway Defendants, Plaintiff's neighbors, and that the January 18, 2019 Notice of Violation was sent to Plaintiff by certified and regular mail. (Radnor Ex. 18.) See Johnson v. City of Philadelphia, No. 19-cv-1591 2020 WL 2933853 (E.D. Pa. June 3, 2020) (relying on Jones v. Flowers, 547 U.S. 220, 226 (2006)) ("Notice by certified mail is sufficient for due process purposes so long as the government has 'heard nothing back indicating that anything ha[s] gone awry.'").

Plaintiff fails to address why the following actions by Kochanski provided her insufficient notice that her property could be condemned: (1) the December 14, 2018 Notice, which explains that non-compliance could result in further enforcement actions; (2) the January 18, 2019 Notice, which identified two plumbing issues and gave her a deadline of ten days to correct them, identified other violations and gave her a deadline of 90 days to correct them, and explained her right to appeal (Radnor. Ex. 18.); and (3) the fact she was aware the Radnor Defendants filed suit against her in April 2019.[9]

Although the private interest affected here is significant because Plaintiff's home was deemed unsuitable for habitation, "[d]ue process does not require that a property owner receive actual notice before the government may take his property." Jones, 547 U.S. at 226. The government must "provide notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Id. (internal quotations omitted). Here, the undisputed record reflects that the Radnor Defendants made several honest attempts at providing Plaintiff notice, and that notice included informing Plaintiff of her right to appeal.

To the extent Plaintiff argues that her behavior would have been different if the notice of violations stated explicitly that she could be evicted, I am not convinced. Plaintiff seems to play both sides of the coin in that she states that she never received the Notice of Violations (Pl. Dep.

---

[9]     In the administrative warrant application, Radnor Defendants contend they filed a Complaint in Equity and a Petition for a Preliminary Injunction "seeking to compel Hamilton to comply with the Radnor Township Property Maintenance Code." (Radnor Ex. 24.) They claim that after four service attempts, the process server was able to make contact with Plaintiff on May 29, 2019. Apparently, Plaintiff came to the door but refused to open the door and "requested the pleadings be placed in her mailbox." (Radnor Ex. 24.) The Radnor Defendants do not cite to this specifically in their Statement of Facts and Plaintiff has not admitted or denied this statement; however, when asked in her deposition, Plaintiff was aware the Radnor Defendants filed suit against her in April 2019. (Pl. Dep. 65:3-22.)

65:19-22), but states in her Third Amended Complaint that "Defendants Flanigan, Kochanski, and/or Pancoast informed Plaintiff of the plumbing problem." (Third Am. Compl. at ¶ 24.) In either case, Plaintiff fails to establish that she would have benefitted from "additional or substitute procedural safeguards" because she failed to react to the process that was given to her. Mathews, 424 U.S. at 335. This undisputed factual record cannot establish that Kochanski "participated in the alleged constitutional violation or approved of it." Ridgewood Bd. of Educ., 430 F.3d at 173. Accordingly, summary judgment will be entered in favor of Kochanski as to this claim.

Finally, to the extent that Flanagan, Pancoast, and Kochanski violated Plaintiff's right to procedural due process, qualified immunity would apply. Flanagan, Pancoast, and Kochanski are immune from liability so long as the Radnor Defendants could reasonably believe they provided Plaintiff with sufficient procedural due process in light of "clearly established" law. Anderson, 483 U.S. at 638-39. Plaintiff has cited no authority, and I cannot find any, that holds that there was deficient procedural due process provided under circumstances analogous to those presented here. Accordingly, any due process violation that may have occurred was therefore not of a "clearly established" right. Id.

### iv.    Count Five: "False Arrest" (Flanagan, Lacey, Gluck, Geaves)

Plaintiff claims that Radnor Defendants Flanagan, Lacey, Gluck, and Geaves effectuated a false arrest against her in violation of the Fourth Amendment because: (1) Plaintiff was cooperative, and no charges were filed against her; and (2) the length of the altercation with police constituted an arrest.[10] (Pl. Resp. to Radnor MSJ at 6-7.) It is undisputed that Plaintiff was never

---

[10]     Plaintiff brings a claim for "false arrest," but seems to argue that the Radnor Defendants' interaction with her on June 11, 2019 resulted in an unreasonable seizure in violation of the Fourth Amendment.

handcuffed or charged with a crime, so I consider the question of whether the Radnor Defendants detained Plaintiff for an unconstitutionally long time.

"In considering whether an investigative detention has escalated into an arrest 'the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect.'" Hall v. Raech, 677 F. Supp. 2d 784, 793-94 (E.D. Pa. 2010) (citing Baker v. Monroe Twp., 50 F.3d 1186, 1192 (3d Cir. 1995)). "[T]here is no per se rule about the length of time a suspect may be detained before the detention becomes a full-scale arrest. Instead, the court must examine the reasonableness of the detention, particularly whether the police were diligent in accomplishing the purpose of the stop as rapidly as possible." Baker, 50 F.3d at 1192 (relying on United States v. Sharpe, 470 U.S. 675, 685-66, 105 (1985)). Further, "[t]here is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest." Id. at 1193.

Accepting the facts in the light most favorable to Plaintiff as the non-moving party, her account of the encounter with the Radnor Defendants on June 11, 2019 is as follows:

- Lacey responded alone to a 911 call where dispatch relayed that the suspect was armed with a knife and threatening neighbors. (Radnor SOF at ¶ 58.)

- Plaintiff was walking to her neighbors to return the hedge trimmers, when she was "greeted by an undercover cop" who pointed a gun at her and told her to "freeze." (Pl. Dep. 48:2-4.)

- Lacey ordered Plaintiff drop the saw and she complied. Lacey continued to point his gun at Plaintiff.

- Lacey called for backup and after about six minutes, stopped pointing his gun at Plaintiff. Several minutes later, Gluck and Geaves arrived at the scene. Lacey and Geaves left shortly thereafter, but Gluck told her she needed to wait because Superintendent Flanagan wanted to talk to her. (Pl. Dep. 51:15-19.)

- Flanagan arrived ten minutes later and asked Plaintiff to let police in her home, and stated that if she did not, the Radnor Defendants would seek an administrative warrant. (Pl. Resp. to Radnor SOF at ¶¶ 28-30.) Plaintiff refused and she was free to go.

- The entire encounter with the Radnor Defendants lasted about 26 minutes. (Pl. Resp. to Radnor SOF at ¶ 67.)

The Radnor Defendants were responding to a 911 call about a suspect armed with a knife who had threatened her neighbors. Lacey testified that he saw Plaintiff holding what appeared to be a machete or a knife. (Lacey Dep. 21:7-17.) When Plaintiff dropped the weapon, Lacey asked her to sit on the curb until "the officers got finished at the Ridgeway's house." (Lacey Dep. 35:18-21.) Plaintiff makes no argument as to how Lacey's actions are unreasonable. Lacey explained that Radnor Defendants had to talk to the Ridgeway Defendants, as the party that called 911, to gain an understanding of what transpired between Plaintiff and the Ridgeway Defendants. To the extent that Plaintiff claims she was detained until Flanagan arrived, the record reflects the responding officers were engaged in a continuing investigation of the 911 call. Summary judgment will be entered in favor of the Radnor Defendants as to this claim.

For similar reasons as discussed above, even if Plaintiff's Fourth Amendment rights were violated, Flanagan, Lacey, Gluck, and Geaves are immune from liability "unless existing precedent squarely governs the specific facts at issue." Kisela, 138 S. Ct. at 1153. Plaintiff has not cited a case, and I cannot find any, that holds that conduct like what the Radnor Defendants engaged in here violates the Fourth Amendment. Accordingly, any violation that may have occurred was not of a "clearly established" right. Anderson, 483 U.S. at 638-39.

### v.   Count Six: Excessive Force (Flanagan, Lacey, Gluck, Geaves)

Plaintiff claims that pointing a gun at her constitutes excessive force because she "never threatened" the Radnor Defendants and she had no prior criminal record. (Pl. Resp. to Radnor SOF ¶ 63.) She also argues that she never threatened the Ridgeway Defendants, such that the 911

dispatch call was inaccurate. The Radnor Defendants claim it was reasonable for Lacey to unholster his gun given that he was responding to a 911 call about a person armed with a knife who was reportedly threatening her neighbors, and Plaintiff refused to drop the weapon when she was first instructed. (Radnor MSJ at 25-26.)

"Claims of excessive force against law enforcement officers brought by persons outside of police custody are analyzed under the Fourth Amendment." Jefferson v. Lias, 21 F.4th 74, 78 (3d Cir. 2021) (citing Graham v. Connor, 490 U.S. 386 (1989)). To succeed on a claim of excessive force under the Fourth Amendment, "a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." Id. at 78. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal citations and quotations omitted.) Further, the reasonableness of any use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. "The inquiry is an objective one, however, and the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Jefferson, 21 F.4th at 78.

The facts, taken in the light most favorable to Plaintiff as the non-moving party, establish the following:

- Lacey responded alone to a 911 call where dispatch relayed that the suspect was armed with a knife and threatening neighbors. (Radnor SOF at ¶ 58.)

- When Lacey pulled up to Plaintiff in his patrol car, he exited his vehicle, ordered her to drop the hedge clippers, and held her at gun point for six minutes while he called for backup. (Pl. Dep. 48:9-49:19.) Lacey ordered Plaintiff to sit but she said she could not because she was wearing a dress, so he allowed her to stand. (Id. at 50:16-22.)

- By the time the other officers, Gluck and Geaves, arrived, Lacey had put his gun away. (Id. at 50:11-13.)

- Lacey explained to Plaintiff someone had called 911 alleging she was trying to "attack them with a knife." (Id. 48:11-12.)

- Plaintiff was not handcuffed, and she was not subject to any additional physical force by the Radnor Defendants other than what is listed above.

It is undisputed that Flanagan, Gluck, and Geaves did not touch Plaintiff, point a weapon at Plaintiff, or exert physical force on Plaintiff in any way. Accordingly, Plaintiff has failed to create a genuine dispute of material fact as to these three Defendants and summary judgment will be granted in favor of Flanagan, Gluck, and Geaves.

There are several disputes of fact as to the interaction between Plaintiff and Lacey on June 11, 2019. The parties dispute whether Lacey's gun was pointed at Plaintiff or in the low-ready position; whether Plaintiff dropped the hedge clippers when Lacey initially asked her, or if she was non-compliant at first; and whether Lacey's gun was unholstered for five to six seconds, or whether it was out for six minutes. (Lacey Dep. 21:7-23; 31:15.) There is no body camera footage of the encounter; however, there is a police report and a use of force report written because Lacey unholstered his gun. Plaintiff disputes the accuracy of these reports. (Pl. Resp. to Radnor SOF ¶ 66.)

Some of these disputes of fact may be material. However, I need not, and will not, decide whether Lacey violated Plaintiff's Fourth Amendment rights because taking the facts in the light most favorable to Plaintiff, Lacey is at least entitled to qualified immunity. Lacey is immune from liability "unless existing precedent squarely governs the specific facts at issue." Kisela, 138 S. Ct. at 1153. Plaintiff has cited no authority, and I cannot find any, that holds that it is unreasonable for Lacey to conduct himself as he did here. Any Fourth Amendment violation that may have occurred was not of a "clearly established" right. Anderson, 483 U.S. at 639.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff has not demonstrated that there are genuine disputes of material fact as to all of her asserted claims against the Defendants. Accordingly, Plaintiff's claims fail as a matter of law, and I will grant summary judgment in favor of Defendants.

An appropriate Order follows. [11]

---

[11]    Because I am granting Defendants' Motions for Summary Judgment, the Radnor Defendants' "Motion Preclude the Testimony of Mickie W. McComb" (ECF No. 203) is now moot.